Nina MANKE and Johanna L. Manke,
Plaintiffs-Appellants,†

v.

PHYSICIANS INSURANCE COMPANY OF WISCONSIN, INC.,
David J. Hendrickson, M.D., Franciscan Skemp
Medical Center, a/k/a Franciscan Skemp
Healthcare, Inc., Wisconsin Patients
Compensation Fund, WEA Insurance and
ABC Insurance Company,
Defendants-Respondents.

Court of Appeals

*No. 2005AP1103. Submitted on briefs December 7, 2005.
—Decided February 9, 2006.*

2006 WI App 50

(Also reported in 712 N.W.2d 40.)

† Petition to review denied 5-9-06.

751

754

760

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Gregory J. Egan, Esquire, O'Flaherty Heim Egan, Ltd.*, La Crosse.

On behalf of the defendant-respondent, Wisconsin Patients Compensation Fund, the cause was submitted on the brief of *Tom Rusboldt* and *Christine A. Gimber, Weld, Riley, Prenn & Ricci, S.C.*, Eau Claire; and on behalf of the defendants-respondents, Physicians Insurance Company of Wisconsin, Inc., David J. Hendrickson, M.D., and Franciscan Skemp Medical Center, the cause was submitted on the brief of *John W. Markson* and *Sheila M. Sullivan, Bell, Gierhart & Moore, S.C.*, Madison.

Before Dykman, Vergeront and Deininger, JJ.

¶ 1. VERGERONT, J. In this medical malpractice action, the primary issue on appeal is whether the circuit court erred in setting aside the jury verdict against the defendants and ordering a new trial because a juror brought a dictionary definition of "neglect" into the jury room. The circuit court determined that this was extraneous information and was prejudicial. While

we agree that the circuit court made some legal errors in arriving at its conclusion, we affirm because the competent juror testimony supports the circuit court's factual determinations and satisfies the correct legal standard for a new trial. We also affirm the circuit court's decision that the new trial should be on the issue of causation as well as on negligence.

¶ 2. A secondary issue is whether the circuit court erred in dismissing the Wisconsin Patients Compensation Fund before the new trial. For the reasons we explain in this opinion, we conclude the circuit court did not err and we affirm the order dismissing the Fund.

## BACKGROUND

¶ 3. Johanna Manke, then seventeen, jumped into a friend's swimming pool and felt the onset of pain. She sought medical care at the emergency room of Franciscan Skemp Medical Center and was treated by David Hendrickson, MD.[1] Johanna and her mother, Nina Manke, (collectively, the Mankes) filed this action alleging that the medical center and Dr. Hendrickson were negligent and their negligence caused injuries to Johanna and damages to both her and her mother. The complaint also named the Fund as a defendant.

¶ 4. The case was tried to a jury on the issues of negligence, causation, and damages. On the second day of jury deliberations, before the jury returned its verdict, the parties entered into a "high-low" agreement on the record in open court. Under the agreement the

[1] There is no transcript from the trial included in the record. We do not rely on the recitation of the trial evidence in the briefs, except in our general statement of the circumstances under which Johanna Manke sought medical care, a point on which all parties agree.

defense was to pay at least $100,000, even if the jury returned a verdict of no liability, and was to pay no more than $800,000, even if the verdict on damages was for more than that; if the verdict on damages was between $100,000 and $800,000, the defense was to pay the verdict amount plus costs. The parties stipulated that this agreement presumed a "legally sufficient jury verdict."[2]

¶ 5. The jury returned its verdict later the same day. It found that Dr. Hendrickson was negligent in his care and treatment of Johanna and that this negligence was a cause of Johanna's injuries. The verdict form given the jury identified $71,967.45 as the amount of past healthcare expenses for Johanna. The jury awarded Johanna $245,000 for future healthcare expenses and $675,000 for pain, suffering, and disability; it awarded $5,000 to her mother for services rendered to Johanna. The verdict form did not indicate any dissents to the questions on negligence and causation, but did indicate dissents on elements of the damages.[3]

---

[2] Although the Mankes argued in the circuit court that the "high-low" agreement precluded the defendants' post-verdict motion for a new trial, they do not renew that argument on appeal. Accordingly, we do not decide whether the agreement precludes a new trial on negligence and causation.

[3] There are two verdicts in the record, one bearing a handwritten "I" and the other bearing a handwritten "II." They are identical except that verdict II does not contain the names of two jurors dissenting to elements of damages that are shown on verdict I. (Both show the name of a third juror dissenting to two elements of damages.) The parties do not make any distinction between these verdicts in their citations to the record or their arguments. We therefore assume the difference in the verdicts is not significant to the issues on this appeal.

¶ 6. About three weeks after the verdict was returned, Dr. Hendrickson filed a motion asking the court to set aside the verdict and order a new trial on the ground that inappropriate material had been introduced into the jury room and it was prejudicial to the defense.[4] Accompanying the motion was an affidavit of a paralegal employed by defense counsel that averred as follows. Defense counsel informed him that counsel had learned from jurors Maria Stevens and Donald Bahr that another juror had brought a dictionary definition of "negligence" into the jury room. At counsel's instruction the paralegal attempted to contact all of the jurors and was successful in speaking to three: Stevens, Jennifer Flottmeier, and John Parins. While none of the three was willing to sign an affidavit, Stevens confirmed what she had told defense counsel. Flottmeier stated that one of the jurors photocopied a dictionary definition of "negligence" and shared it with the jury as a whole after deliberations commenced on the second day; the group discussed the definition during its deliberations; and the definition helped to sway "quite a few" jurors toward deciding that Dr. Hendrickson was negligent. Parins stated that the jury was split on the question of Dr. Hendrickson's negligence during the first day of deliberations; on the second day a juror brought in a dictionary definition of "negligence," which he shared with other jury members; that juror told the others that during the first day he had been uncertain

---

[4] The motion is brought in the name of Dr. Hendrickson and Physicians Insurance Company of Wisconsin; however, the responsive brief on appeal is filed on behalf of both Dr. Hendrickson and Franciscan Skemp Medical Center. Because the distinction between Dr. Hendrickson and the Medical Center is not relevant to the issues on this appeal, we will refer only to Dr. Hendrickson.

whether Dr. Hendrickson was negligent, but reading the definition convinced him that Dr. Hendrickson was negligent; the dictionary definition became part of the discussion in the deliberation process; it helped to sway the thinking of other jurors in a similar manner; and he, Parins, considered the definition "useful."

¶ 7. The Mankes opposed the motion and submitted the affidavit of juror Bahr. Bahr averred that before the jury left the courtroom on the first day of deliberations it had reached a verdict on the first question regarding negligence: eleven jurors agreed that Dr. Hendrickson was negligent and one was undecided or dissenting on this issue. He also averred that no extraneous information such as a dictionary definition was discussed on the first day prior to the time the jury decided to answer the first question "yes." The Mankes also submitted the affidavit of their counsel to which was attached the definitions of "negligence" from a number of different dictionaries.

¶ 8. Based on these affidavits, the parties' briefs, and their arguments, the court concluded that Dr. Hendrickson had made a sufficient showing to entitle him to an evidentiary hearing at which the jurors would testify. The court explained that the submissions had established a prima facie case that extraneous information was improperly brought to the attention of the jurors and was potentially prejudicial. On this last point, the court noted that it was not known what specific definition was brought in, but its own review of a few dictionaries indicated that some definitions of "negligence" mentioned repeated acts or recklessness. The court also reasoned that the definition of "negligence" in a medical malpractice case is technical and different from "the standard negligence definition." The court's comments also suggest that the court wanted to

evaluate whether a dictionary definition was actually provided to the jurors and, if it was, the circumstances surrounding the incident. The Mankes' counsel proposed that instead of subpoenaing all twelve jurors, the first step should be obtaining the dictionary definition from the juror who brought it in. However, the court decided to proceed with a hearing.

¶ 9. At the evidentiary hearing all twelve jurors were examined by defense counsel and cross-examined by the Mankes' counsel. Juror Matt Knutson testified that on the morning of the second day of deliberations[5] he brought in a copy of a dictionary page containing the definition of "neglect." This page was admitted into evidence. The definition of "neglect" on this page is: "1. To pay no attention to: ignore. 2. To fail to give proper care or attention to. 3. To fail to do or accomplish, as through carelessness." Knutson had highlighted the first two definitions. He did not show the page to the other jurors but read to them the second definition of "neglect." On the photocopied page, the third entry below "neglect" is "negligent": "1. Marked by or inclined to neglect, esp. habitually. 2. Extremely heedless."

¶ 10. None of the other jurors disputed that a juror had brought in a dictionary definition on the morning of the second day, although one juror did not remember. The jurors' testimony varied on what word was defined—"neglect," "negligence" or "negligent"— with two not remembering what the word was. There was also a conflict in the testimony over whether juror Knutson simply read the definition aloud or also showed it to other jurors.

---

[5] From the testimony of all the jurors, it appears that deliberations began late in the day on February 1, 2005.

¶ 11. Defense counsel asked all the jurors what the vote on the negligence question had been at the end of the first day, what discussion had occurred about the dictionary definition, and how the definition had affected their views. The Mankes' counsel objected to these questions based on the jurors' incompetency under Wis. Stat. § 906.06.[6] The court overruled the objections and allowed the jurors to testify on these matters.

¶ 12. After the close of evidence and argument, the court made the following factual findings. At the end of the first day of deliberations, ten jurors had not agreed on the answer to the first question, which asked whether Dr. Hendrickson was negligent, and at the beginning of the second day they were still discussing that question. A juror brought in a photocopy of "neglect," not "negligent" or "negligence," and shared the definition with others. The juror must have done more than read the definition to the others, because at least one juror testified that the definition had been highlighted. At least some of the jurors, and "probably all," saw not only the highlighted definitions of "neglect" but "everything as far as [the photocopy of the dictionary page] is concerned." The definition was discussed by the other jurors and at some point after that the vote changed. As to the effect of the definition on the jurors, the court noted that the juror who brought it in had clearly testified that he changed his mind based on the definition; one other juror seemed to have been affected by it; and it was hard to tell about the others.

¶ 13. Based on its findings, the court determined that the defense had met its burden to establish that extraneous information was brought into the jury

_____

[6] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

room. As for whether this information was prejudicial, the court referred to case law using the term "potentially prejudicial" and determined that standard was met.[7] The court also decided that, even if Dr. Hendrickson had to show actual prejudice, he had done so because one juror testified that the information had changed his mind, and another said that the jurors "had their eyes opened because of it." In its discussion of prejudice, the court observed that the definition of "neglect" was not the standard in a medical malpractice case, which has a "particular, unique, and somewhat technical definition."

¶ 14. After making this ruling the court addressed the scope of the new trial. Dr. Hendrickson's position was that it should be on negligence and causation, but not damages. The Mankes' position was that the new trial should be on negligence only. The Fund stated that the new trial should not be on damages and it had no position on the other issues. The court accepted the parties' agreement that the new trial should not include damages. This prompted the Fund to request the court to dismiss it from the case because the damage award was less than the $1,000,000 coverage limits of Dr. Hendrickson's insurance.[8] The Mankes' counsel responded that it was premature to dismiss the Fund

---

[7] As we explain in ¶¶ 19, 20, and 32, "potential prejudice" is a necessary element for the admissibility of juror testimony on extraneous information, and there is a different standard for determining whether extraneous information is prejudicial for purposes of granting a new trial.

[8] Under Wis. Stat. § 655.27(1) the Fund pays that portion of a malpractice award that is in excess of either the limits required by Wis. Stat. § 655.23(4) or the maximum for which the healthcare provider is insured. The applicable statutory limit here is $1,000,000. Section 655.23(4)(b)2.b.

because the Mankes intended to appeal. The Fund's counsel replied that it was seeking a dismissal only at the circuit court level. There was no further comment by the parties, and the court granted the motion.

¶ 15. Subsequently the court issued a written decision in which it held that the new trial should be on causation as well as negligence. The court reviewed the evidence at trial and concluded that the issues of negligence and causation were so closely related that they were "almost the same question" and therefore the dictionary definition of "neglect" probably affected the jury's decision on causation.[9]

## DISCUSSION

I. New Trial Based on Prejudicial Extraneous Information

¶ 16. The Mankes contend that the circuit court erred in setting aside the verdict and ordering a new trial based on the dictionary definition brought into the jury room by a juror because: (1) Dr. Hendrickson did not make a sufficient preliminary showing to entitle him to an evidentiary hearing at which the jurors testified; (2) the court relied on incompetent testimony under WIS. STAT. § 906.06(2); and (3) the standard for prejudice was not met.[10]

---

[9] The Mankes petitioned for leave to appeal the non-final order granting a new trial, and we granted the request. *See* WIS. STAT. RULE 809.50.

[10] We have not followed the organization of issues presented in the Mankes' brief, but instead have organized the issues to track the proper analytical framework as we explain it below.

A. Applicable Legal Standards

¶ 17. A party is entitled to a new trial when prejudicial extraneous information is brought to the attention of the jury. *See State v. Eison*, 194 Wis. 2d 160, 171–73, 533 N.W.2d 738 (1995). In general, a circuit court's decision whether to grant a motion for a new trial involves the court's exercise of discretion. *Id.* at 171. We affirm discretionary decisions if the record shows the court considered the facts of the case and arrived at a reasonable conclusion based on the applicable law. *Id.* A motion for a new trial on the ground of prejudicial extraneous information requires the circuit court to make a number of underlying evidentiary, factual, and legal determinations, and we apply different standards of review to these underlying determinations depending on the nature of the determination. *See id.* A circuit court's erroneous view of the facts or law constitutes an erroneous exercise of discretion. *Id.* at 171.

¶ 18. If the evidence supporting the ground for a new trial depends upon the testimony of a juror, the circuit court must first make the evidentiary determination whether the juror is competent to testify under WIS. STAT. § 906.06(2). *Eison*, 194 Wis. 2d at 172. Section 906.06(2) provides:

> **(2)** INQUIRY INTO VALIDITY OF VERDICT OR INDICTMENT. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict

or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

¶ 19. In order for a juror's testimony to be competent under the "extraneous information" exception, the moving party must establish: "(1) that the juror's testimony concerns extraneous information (rather than the deliberative process of the jurors), (2) that the extraneous information was improperly brought to the jury's attention, and (3) that the extraneous information was potentially prejudicial." *Eison,* 194 Wis. 2d at 172 (citations omitted). Information is "improperly brought to the jury's attention" even if only one juror possesses the information. *Castaneda v. Pederson,* 185 Wis. 2d 199, 211, 518 N.W.2d 246 (1994). While the admissibility of evidence in general involves the exercise of discretion, the construction and application of the standards in an evidence statute may involve questions of law, which we review de novo. *See State v. Peters,* 166 Wis. 2d 168, 175, 479 N.W.2d 198 (Ct. App. 1991).

¶ 20. If the circuit court decides that a juror's testimony is competent under Wis. Stat. § 906.06(2), the court then determines whether the competent juror testimony and any other admissible evidence establishes that the moving party is entitled to a new trial. *After Hour Welding, Inc. v. Laneil Mgmt. Co.,* 108 Wis. 2d 734, 740–41, 324 N.W.2d 686 (1982). "This is not a

requirement of [§ 906.06(2)], since that section deals only with the competency to testify and the admissibility of evidence." *Id.*

¶ 21. When the ground for the new trial is prejudicial extraneous information, the court must make both a factual and a legal determination in order to decide whether to grant a new trial. *State v. Broomfield,* 223 Wis. 2d 465, 479, 589 N.W.2d 225 (1999). First, the court must decide whether there is "clear, satisfactory, and convincing evidence that the juror made or heard the statements or engaged in the conduct alleged." *Id.* at 479. We affirm the circuit court's findings of fact unless they are clearly erroneous. *See id.* at 480.

¶ 22. Second, if the circuit court determines that the evidence is clear, satisfactory, and convincing, it must then make the legal determination whether the extraneous information constitutes prejudicial error requiring reversal of the verdict. *Id.* at 479. In a civil case the prejudice inquiry asks whether there is a reasonable probability that the extraneous information would have a prejudicial effect upon a hypothetical average juror. *Castaneda,* 185 Wis. 2d at 212. Because this is a question of law, our review is de novo. *Id.*

¶ 23. With this framework established, we analyze each of the Mankes' contentions of error.

### B. Propriety of an Evidentiary Hearing

¶ 24. The Mankes contend that the paralegal's affidavit was insufficient to permit the circuit court to hold an evidentiary hearing because the affidavit did not aver facts that, if true, would require a new trial. In support of this contention, the Mankes make two

arguments: (1) a dictionary definition of a common word is not "extraneous information," and (2) because the affidavit does not identify the particular definition, there was no showing of prejudice.[11]

¶ 25. The Mankes are correct that a party seeking to set aside a verdict on the ground of prejudicial extraneous information is not automatically entitled to an evidentiary hearing at which jurors testify. In *State v. Marhal*, 172 Wis. 2d 491, 497, 498 n.5, 493 N.W.2d 758 (Ct. App. 1992), we stated that, in order to obtain an evidentiary hearing at which jurors testify, the moving party must make a preliminary showing by affidavit or nonjuror evidence that the subject matter of the proposed hearing is within an exception in Wis. Stat. § 906.06(2) and must assert facts that, if true, would require a new trial. In *Marhal*, these two showings were distinct issues because the asserted ground for a new trial was not prejudicial extraneous information but bias displayed by jurors' words or conduct during deliberations. *Id.* at 493–94. We concluded that neither showing was made. *Id.*

¶ 26. In this case, because the asserted ground for a mistrial is prejudicial extraneous information, the Mankes' contention that the affidavit does not set forth facts showing extraneous information is a challenge both to the admissibility of the jurors' statements under Wis. Stat. § 906.06(2) and to the sufficiency of the substantive showing of entitlement to a new trial. In

---

[11] The Mankes refer in passing to the paralegal's affidavit as "hearsay" with respect to the three jurors' statements, but do not develop an argument that it was improper for this reason for the court to consider the affidavit to determine if an evidentiary hearing was necessary or appropriate. Accordingly, we do not further address this issue.

addition, in order to determine the sufficiency of the substantive showing, it is necessary to first decide what, if any, juror statements in the paralegal's affidavit are admissible under § 906.06(2). We therefore begin with the issue of the competency of the jurors' statements related in the paralegal's affidavit, addressing the Mankes' contentions in that context; we then consider whether the competent statements make a sufficient substantive showing for an evidentiary hearing.[12]

1. Preliminary Showing of Competency

¶ 27. We address first the Mankes' argument that the three jurors' statements related in the paralegal's affidavit do not show extraneous information because a dictionary definition of "negligence," a common word, is not extraneous information under Wis. Stat. § 906.06(2). We view this argument as presenting a question of law, which we review de novo. *See State v. Messelt*, 185 Wis. 2d 254, 274–76, 518 N.W.2d 232 (1994) (supreme court apparently deciding de novo that the information there met the definition of "extraneous").

¶ 28. Neither party has brought to our attention a published Wisconsin decision directly addressing and resolving this issue. In *State v. Ott*, 111 Wis. 2d 691, 696–97, 331 N.W.2d 629 (Ct. App. 1983), a case cited by neither party, we decided that the defendant was entitled to a new trial because a dictionary definition of

---

[12] We confine our analysis to the paralegal's affidavit submitted by the defense and do not discuss the affidavit of juror Bahr submitted by the Mankes. If the paralegal's affidavit is a sufficient showing for an evidentiary hearing, then any conflicting competent statements in juror Bahr's affidavit serve only to point out the need for an evidentiary hearing.

"depraved" brought to the jury room by a juror probably had a prejudicial effect on the hypothetical average juror. Although we referred to the dictionary definition as "extraneous material," *id.* at 696, there was no dispute on that point; thus, there was no need to decide whether the definition was "extraneous material." The same is true of *Banaszek v. F. Mayer Boot & Shoe Co.*, 155 Wis. 127, 143 N.W. 1062 (1913), which Dr. Hendrickson cites: there the court affirmed a circuit court's determination of prejudice but did not decide whether the dictionary definition was "extraneous information."[13]

¶ 29. The supreme court has defined "extraneous information" as "knowledge coming from the outside." *State v. Shillcutt*, 119 Wis. 2d 788, 794, 350 N.W.2d 686 (1984) (defining "extraneous" as something "existing or originating outside or beyond: external in origin: coming from the outside"). Extraneous information is information that is neither of record nor in the general knowledge and accumulated life experiences we expect jurors to possess. *Castaneda*, 185 Wis. 2d at 210; *Johnson v. Agoncillo*, 183 Wis. 2d 143, 162, 515 N.W.2d 508 (Ct. App. 1994).[14] The court in *Castaneda* concluded that a statistic on average medical malpractice awards that a juror obtained by going to the public library and shared with other jurors was extraneous information. 185 Wis. 2d at 210. The court explained

---

[13] Both parties cite cases from other states, but we resolve the issues presented on this appeal under Wisconsin law.

[14] In *State v. Delgado*, 215 Wis. 2d 16, 25 n.2, 572 N.W.2d 479 (Ct. App. 1997), *rev'd on appeal on other grounds,* 223 Wis. 2d 270, 588 N.W.2d 1 (1999), we stated that *Johnson* was overruled on other grounds *sub silentio* by *State v. Messelt*, 185 Wis. 2d 254, 518 N.W.2d 232 (1994).

that this was not "the general knowledge about damage awards that we expect jurors to possess," but a precise statistic obtained not from the record but from the juror's independent research. *Id.* In contrast, this court in *Johnson* concluded that jurors' knowledge that a physician's career might be adversely impacted by a finding of medical malpractice is not " 'beyond the jurors' general knowledge and accumulated life experiences.' " 183 Wis. 2d at 162 (citation omitted).

¶ 30. In this case, according to the paralegal's affidavit, the information the juror shared with the other jurors was not his understanding of what negligence means based on his own experiences. Rather, he read the definition he found in a dictionary. We conclude that a specific dictionary definition of a word—even a common word—is not the type of general knowledge or accumulated life experiences that we expect jurors to possess. In addition, the only reasonable inference from the jurors' statements in the affidavit is that the dictionary definition the juror read was not part of the trial record but was the result of the juror's independent consultation of a dictionary. We therefore conclude that the dictionary definition of "negligence," which, the three jurors stated, was brought to the jury room and read aloud by another juror, was "extraneous information."

¶ 31. We observe that the Mankes do not argue that, if the dictionary definition is extraneous information, it was properly brought to the jury's attention. Because "[i]nformation not on the record is not properly before the jury," *Eison*, 194 Wis. 2d at 175 (citations omitted), this is an appropriate concession.

¶ 32. We next consider the Mankes' argument that the paralegal's affidavit is insufficient because it does

not state what definition of "negligence" was read to the jury and, thus, it does not show prejudice. The standard for prejudice when analyzing competency is lower than the standard for prejudice when deciding whether a new trial is warranted. *Broomfield*, 223 Wis. 2d at 478, citing *Messelt*, 185 Wis. 2d at 276. In order for a juror's testimony to come within the extraneous information exception under WIS. STAT. § 906.06(2), the information must be "potentially prejudicial," meaning "information that conceivably relates to a central issue of the trial." *Broomfield*, 223 Wis. 2d at 478, citing *Eison*, 194 Wis. 2d at 176. Without question a dictionary definition of "negligence" relates to a central issue of the trial in this case on the Mankes' claim that Dr. Hendrickson was negligent. Thus, whether we view the issue of "potential prejudice" as a discretionary decision on which we defer to the circuit court or a question of law subject to de novo review, our conclusion is the same: the circuit court did not err in deciding that there was potential prejudice even though the affidavit did not identify the particular definition of "negligence" read to the jurors.

¶ 33. We conclude that the jurors' statements in the paralegal's affidavit—that a juror brought in a dictionary definition of "negligence" on the morning of the second day of deliberations and read it to them—come within the extraneous information exception in WIS. STAT. § 906.06(2) and are thus competent testimony. The three jurors' testimony on these points therefore would be admissible at an evidentiary hearing.

¶ 34. We agree with the Mankes that other juror statements in the paralegal's affidavit are not, as a matter of law, competent testimony under WIS. STAT.

§ 906.06(2). The juror statements on how the dictionary definition affected their views and the views of other jurors on Dr. Hendrickson's negligence is incompetent testimony under § 906.06(2). It is testimony on "the effect of [the definition] upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith"; and it does not come within the exception for testimony on "whether extraneous prejudicial information was improperly brought to the jury's attention . . . ." Section 906.06(2).

¶ 35. In order to constitute competent testimony, a juror's testimony must concern the extraneous information rather than the thought processes or deliberations of the jurors. *State v. Poh*, 116 Wis. 2d 510, 520, 343 N.W.2d 108 (1984). Thus, a juror's testimony on how the jurors considered another juror's remark is not competent "because it impermissibly offers evidence of a juror's subjective mental processes." *Messelt*, 185 Wis. 2d at 281. *See also Castaneda*, 185 Wis. 2d at 217 (restrictions on admissibility of juror testimony in WIS. STAT. § 906.06(2) barred jurors from testifying on whether the extraneous information affected their deliberations); *Eison*, 194 Wis. 2d at 176 (inquiry into jurors' interpretations of results of experiment with extraneous object during jury deliberations would improperly invade mental process of the jury, resulting in incompetent testimony under § 906.06(2)).

¶ 36. Because the circuit court here did not refer to the incompetent juror statements in explaining why an evidentiary hearing was necessary, we have no basis for believing, as the Mankes appear to suggest, that the court considered the incompetent statements in mak-

ing that decision. In any event, in reviewing whether the circuit court properly granted an evidentiary hearing, we consider only those juror statements in the paralegal's affidavit that we have concluded are competent under WIS. STAT. § 906.06(2).

### 2. Preliminary Showing of Substantive Grounds

¶ 37. We now turn to the Mankes' argument that the competent juror statements in the affidavit, if true, do not entitle Dr. Hendrickson to a new trial, and the circuit court therefore erred in holding an evidentiary hearing. We have already concluded that the competent statements show that the dictionary definition was extraneous information improperly brought to the attention of the jurors. If the circuit court believed these statements, it could find they constituted clear and convincing evidence that a juror brought extraneous information to the attention of the other jurors. As we have explained above, the other determination necessary for a new trial is that there is a reasonable probability that the extraneous information would have a prejudicial effect upon a hypothetical average juror. *Castaneda*, 185 Wis. 2d at 210, 212. We understand the Mankes to argue that there was an insufficient factual basis to support this legal conclusion without an identification of the particular definition of negligence read to the jurors, and, thus, the circuit court could not properly hold an evidentiary hearing. We disagree.

¶ 38. We first observe that it is not always necessary to determine the exact dictionary definition of a word that is brought into the jury room in order to determine whether it had a probable prejudicial effect

upon the hypothetical average juror. This principle is illustrated by *Ott*, where we agreed with the circuit court that the specific dictionary definition of "depraved" brought into the jury room did not need to be identified in order to determine whether there was prejudice. 111 Wis. 2d at 695–96. In *Ott*, several dictionary definitions were attached to the moving party's briefs, and, we stated, "we researched a number of others." *Id.* at 695. Because none of these definitions of "depraved" contained an element that was in the jury instruction, we concluded that it was not possible that the definition actually brought in contained this element. *Id.* We then concluded that the dictionary definition brought in "was sufficiently broader than the technical meaning embodied in the instruction" such that "the probable effect upon a hypothetical average juror would be prejudicial."[15] *Id.* at 696.

¶ 39. In this case, unlike *Ott*, the circuit court decided that it could not make a determination on the prejudice required for a new trial without knowing what the dictionary definition was. We do not agree with the Mankes that our statement in *Marhal*—that "the preliminary showing must assert facts, that, if true, would require a new trial," 172 Wis. 2d at 497— prohibits the circuit court from holding a hearing in

---

[15] In *State v. Ott*, 111 Wis. 2d 691, 696–97, 331 N.W.2d 629 (Ct. App. 1983), a criminal case, we used the prejudice test of "probable effect upon a hypothetical average jury" from *After Hour Welding, Inc. v. Laneil Management Co.*, 108 Wis. 2d 734, 740–42, 324 N.W.2d 686 (1982), a civil case. This appears to be an error. In *State v. Poh*, 116 Wis. 2d 510, 525, 343 N.W.2d 108 (1984), the court decided that the "reasonable probability" test of *After Hour Welding* could not be applied to a criminal defendant's motion to impeach a verdict and it adopted the "reasonable possibility" test.

these circumstances. Our statement in *Marhal* was made in the context of explaining why the circuit court there improperly held a hearing at which jurors testified, based on a motion that sought a hearing "to form a factual basis" for the allegations in the motion, which allegations, in any event, did not come close to meeting the applicable standard for a new trial. *Id.* at 494, 497, 498–99 n.5. Because the preliminary showing in *Marhal* was so wholly inadequate, we did not address the level of detail needed for a sufficient showing.

¶ 40. The Mankes' reading of *Marhal* is not consistent with supreme court cases decided both before and after *Marhal* in which the supreme court has either implicitly or explicitly approved of a circuit court holding an evidentiary hearing to gather additional facts after a preliminary showing of extraneous information improperly brought to the attention of the jurors. *See, e.g., After Hour Welding*, 108 Wis. 2d at 742–43 (court remands for hearing to take evidence on matters including when specifically the statement was made, what the circumstances were, what jurors were present, and "other relevant facts about the statement which will assist the trial court to assess the prospect of unfair prejudice"); *Poh*, 116 Wis. 2d at 514–15 (after receiving an affidavit and statements from some jurors that during deliberations two jurors made comments about the defendant's prior driving record, circuit court held an evidentiary hearing in which eleven of the twelve jurors were questioned to determine whether information outside the record had been brought to their attention, the nature of the information, and the circumstances under which it had been brought to their attention); *Shillcut*, 119 Wis. 2d at 791, 792 (circuit court held hearing questioning affiant juror on what jurors were present when statement was made and

when it was made); *Messelt,* 185 Wis. 2d at 282 (circuit court's handling of motion for new trial based on prejudicial extraneous information was "altogether appropriate" where "[t]he court considered [the defendant's] motion [and] exercised its discretion to allow [the defendant] to question the jurors at the post-conviction hearing . . . .").

¶ 41. We harmonize these supreme court cases and *Marhal,* 172 Wis. 2d at 497, with this holding: where a motion for a new trial is based on prejudicial extraneous information, the circuit court may grant an evidentiary hearing upon an affidavit that shows juror statements that are competent testimony and, if believed, are clear and convincing evidence of extraneous information that is potentially prejudicial. In these circumstances a circuit court may properly hold an evidentiary hearing both to evaluate the credibility of the initial statements, *see After Hour Welding,* 108 Wis. 2d at 742–43, and to obtain additional competent testimony bearing on prejudice such as the specific nature of the extraneous evidence and the circumstances under which it came to the jury's attention. *See id.* and *Poh,* 116 Wis. 2d at 515.

¶ 42. The paralegal's affidavit here made the requisite showing for holding an evidentiary hearing under this standard and the court's explanation on the purpose of the hearing meets this standard. Accordingly, the circuit court's decision to hold an evidentiary hearing was proper. The court did not need to accept the Mankes' suggestion of ascertaining the exact dictionary definition without a hearing. The court could reasonably decide that a hearing would accomplish the purpose of learning the exact definition, as well as provid-

ing an opportunity to assess credibility and to learn more about the circumstances that might bear on prejudice.[16]

### C. Competency of Testimony at Hearing

¶ 43. We next consider the Mankes' contentions that the circuit court erred in allowing the defense attorney at the hearing to examine Knutson and the other jurors on the effect the definition had on them and the role it played in their discussions and, further, erred in relying on this testimony in determining prejudice. We agree with the Mankes.

¶ 44. As we have already explained in the context of analyzing the paralegal's affidavit, juror testimony on the effect of extraneous information is not competent testimony under Wis. Stat. § 906.06(2). *See* ¶¶ 34–35. The Mankes objected to the questions on this topic and the circuit court overruled the objections. This was an erroneous exercise of discretion because the court failed to apply the correct legal standard. *See Eison*, 194 Wis. 2d at 171.

¶ 45. When a circuit court decides to conduct an evidentiary hearing to determine whether a new trial is warranted based on prejudicial extraneous information, it "must exercise great care to prevent questions con-

---

[16] We emphasize that an evidentiary hearing is not always necessary. A circuit court may conclude that an affidavit is sufficiently thorough to permit it to decide without further proceedings whether there is clear and convincing evidence of extraneous information that had a probable prejudicial effect on the hypothetical average juror. *After Hour Welding*, 108 Wis. 2d at 742–43.

cerning the thought processes of the juror or jurors." *After Hour Welding*, 108 Wis. 2d at 743. The court must not allow inquiry into the effect of the extraneous information; rather, the court determines the effect as a matter of law. *Id.* Indeed, it is precisely because the effect of extraneous information on jurors' thoughts and deliberations is not admissible that the standard for prejudice is an objective one. *See id.* at 741.

¶ 46. In this case the circuit court apparently did not apply the objective standard of the probable effect on a hypothetical average juror. Instead, it appears to have applied a standard of actual prejudice, inquiring whether any of these particular jurors were affected by the dictionary definition. Thus, its determination that there was prejudice was based on incompetent testimony and an incorrect legal standard.

■

¶ 47. Although we agree with the Mankes that the court erred in allowing the jurors to testify on the effect of the dictionary definition and the role it played in their discussions, and also erred in applying an incorrect legal standard to that incompetent testimony, we do not agree that this in itself requires a reversal of the circuit court's decision.

¶ 48. The circuit court's factual determination that there was clear and convincing evidence that extraneous information was brought into the jury room is not based on incompetent testimony and is supported by competent testimony. The competent testimony amply supports the circuit court's finding that on the morning of the second day of deliberations, juror Knutson brought in a photocopy of a dictionary definition of "neglect" and read it to all the jurors and showed it to at least some jurors.

¶ 49. As for the issue of prejudice, because this is a question of law, we can decide it de novo, applying the correct legal standard to the undisputed competent testimony and to the facts found by the circuit court that are supported by competent testimony. We turn to this issue now.

D. Prejudice

¶ 50. The Mankes contend that, based on the competent testimony at the hearing, there is not a reasonable probability that the dictionary definition juror Knutson read to the jurors would have a prejudicial effect upon the average hypothetical juror.

¶ 51. "In determining the probable effect on an average jury we consider factors such as the nature of the extraneous information, the circumstances under which it was brought to the jury's attention, the nature of the plaintiff's case and the defense, and the connection between the extraneous information and a material issue in the case." *Castaneda*, 185 Wis. 2d at 212–13 (citations omitted). Relevant circumstances include the relation between the extraneous information and the topic under deliberation when it is introduced. *Id.* at 214–15. When the extraneous information is a dictionary definition, a comparison of the definition to the jury instructions is a relevant factor. *Ott*, 111 Wis. 2d at 694–96.[17]

_____

[17] The standard for prejudice applied in *Banaszek v. F. Mayer Boot & Shoe Co.*, 155 Wis. 127, 143 N.W. 1062 (1913)—which involved a jury definition—was actual prejudice; and the supreme court stated that the circuit court was in a better position than it was to decide the effect on these particular jurors. 155 Wis. at 129–30. Because of this difference in the legal

¶ 52. As we have already stated, the negligence of Dr. Hendrickson was a central issue at the trial: the first of the four verdict questions asked whether he was negligent with respect to his care and treatment of Johanna Manke. Without the trial transcript, we cannot make a more specific assessment of how the Mankes' case and Dr. Hendrickson's defense might bear on the dictionary definition's effect on a hypothetical average juror. However, it is evident from the parties' briefs, what there is of the record, and the circuit court's decision that significant conflicting evidence focused on this issue and the jurors were aware of its importance.

¶ 53. This jury was instructed on negligence in accordance with WIS JI—CIVIL 1023, as follows:

> In diagnosing Johanna Manke's condition, Dr. David Hendrickson was required to use the degree of care, skill, and judgment which reasonable emergency medicine physicians would exercise in the same or similar circumstances, having due regard for the state of medical science at the time Johanna Manke was diagnosed. A doctor who fails to conform to this standard is negligent. The burden is on Johanna Manke to prove that Dr. Hendrickson was negligent.
>
> A doctor is not negligent, however, for failing to use the highest degree of care, skill and judgment, or solely because a bad result may have followed his care and diagnosis. The standard you must apply in determining if Dr. Hendrickson was negligent is whether Dr. Hendrickson failed to use the degree of care, skill, and judgment which reasonable emergency medicine physicians would exercise given the state of medical knowledge at the time of the diagnosis in issue.

standard for prejudice, we do not agree with Dr. Hendrickson that *Banaszek* is helpful in resolving the prejudice issue in this case.

If you find from the evidence that more than one method for diagnosing Johanna Manke's condition was recognized as reasonable given the state of medical knowledge at that time, then Dr. Hendrickson was at liberty to select any of the recognized methods. Dr. Hendrickson was not negligent because he chose to use one of these recognized diagnostic methods rather than another recognized method if he used reasonable care, skill, and judgment in administering the method.

You have heard testimony during this trial from doctors who have testified as expert witnesses. The reason for this is because the degree of care, skill, and judgment which a reasonable doctor would exercise is not a matter within the common knowledge of laypersons. This standard is within the special knowledge of experts in the field of medicine and can only be established by the testimony of experts. You, therefore, may not speculate or guess what the standard of care, skill and judgment is in deciding this case but rather must attempt to determine it from the expert testimony that you heard during this trial.

¶ 54. The dictionary definition of neglect that juror Knutson testified he read to the jurors was: "to fail to give proper care or attention to," and this is significantly different from the jury instruction.[18] The jury instruction is precise, objective, and technical,

---

[18] Although juror Knutson testified that he read only the second highlighted definition of "neglect" to the jury—"to fail to give proper care or attention to"—the circuit court in its decision referred not to that definition but to the first highlighted definition "to pay no attention to: ignore." The Mankes base their arguments on the second highlighted definition, contending, as we understand it, that a finding by the circuit court that juror Knutson read the first definition to the other jurors was or would be clearly erroneous. Dr. Hendrickson does not dispute this and in his argument on prejudice does not distinguish between the three definitions for "neglect." We take

while the dictionary definition is more generally and broadly stated. The Mankes argue that the two are consistent because the average juror would look to the jury instruction to inform himself or herself on what is "proper." However, the average juror could also use the dictionary definition *instead* of the jury instruction and supply his or her own view of what is "proper." The average juror might do this precisely because the jury instruction is more complicated and technical and thus more difficult to understand and apply than the common and broad concept of "neglect." If a juror did apply the dictionary definition juror Knutson read instead of the jury instruction, there is a reasonable probability that the definition would lead to a view of Dr. Hendrickson's liability that is more expansive and subjective than the standard of care defined in the jury instruction.

¶ 55. The Mankes point to the testimony of all the jurors (including Knutson) that they based their verdict only on the evidence and the jury instructions. However, that is not competent testimony, and the circuit court properly did not consider it. Moreover, in *Ott*, we reversed the circuit court's conclusion of no prejudice based on that circuit court's reasoning that a jury would not ignore the instructions the court told them to

---

this as a concession that a finding that juror Knutson read the first highlighted definition aloud to the other jurors would be clearly erroneous and that there is no dispute he read aloud the second. We therefore confine our analysis of prejudice to the second definition: "to fail to give proper care or attention to." Because we conclude that, with this definition, the requisite prejudice standard is met, we do not discuss the other definitions of neglect. For the same reason, we do not discuss the related definition of "negligent," also on the same photocopied page.

follow. We stated: "We believe the very fact that a juror brought in a dictionary definition to the second day of deliberations and made that fact known to the other jurors contradicts the trial court's conclusion." *Ott*, 111 Wis. 2d at 696. Following our reasoning in *Ott*, we conclude we should not presume a hypothetical average juror would follow a jury instruction rather than a dictionary definition brought in by a juror; instead, we should base our prejudice analysis on a comparison of the jury instruction with the dictionary definition and on other relevant circumstances.

¶ 56. A highly relevant circumstance here is that juror Knutson brought in and read the dictionary definition to the other jurors when the jurors were in the process of deliberating on that very issue. The circuit court found that, when juror Knutson brought in the definition on the morning of the second day, the jurors were still deliberating on the negligence question. This finding is supported by the record. The timing of reading the definition makes it more likely that the dictionary definition would have an impact on the jury. *See Castaneda*, 185 Wis. 2d at 214–15.

¶ 57. We conclude there is a reasonable probability that the dictionary definition of "neglect" would have had a prejudicial effect on the hypothetical average juror. The definition, introduced during the discussion of Dr. Hendrickson's negligence, would probably have the effect on the hypothetical average juror of deflecting attention away from the jury instruction on negligence and away from the expert testimony on standard of care and instead focusing attention on what the juror thought was proper, probably resulting in a more expansive view of negligence. Accordingly, the circuit court's conclusion that the extraneous information had

a prejudicial effect on the jury's determination of negligence was correct, although it employed an incorrect standard and considered incompetent testimony.

E. Scope of the New Trial

¶ 58. The Mankes argue that, even if the circuit court was correct that the extraneous information required a new trial on negligence, the court erred in deciding that the new trial should be on causation as well as negligence.

¶ 59. The circuit court's decision that causation as well as negligence should be retried was based on its assessment of the relationship of the trial evidence on the two issues. Generally, the decision on the scope of a new trial is committed to the discretion of the circuit court, because the circuit court is in a better position than a reviewing court to decide the relationship of the issues tried. *See Badger Bearing, Inc. v. Drives & Bearings, Inc.*, 111 Wis. 2d 659, 673, 331 N.W.2d 847 (Ct. App. 1983). Where the court is ordering a new trial on some issues and it appears that error may have infected other issues, the circuit court acts properly when it orders a new trial on all issues. *Id.* We conclude it is appropriate to review the circuit court's decision to retry causation as a discretionary decision.

¶ 60. Because the circuit court's exercise of discretion was based on its analysis of the relationship of the trial evidence on the issues of negligence and causation, a transcript of the trial is necessary for a review of that decision. However, the record does not contain a transcript of the trial. *See* footnote 1. As the appellant, it is the Mankes' responsibility to present a complete record

for the issues on which they seek review, and we assume that any missing material that is necessary for our review supports the circuit court's determination. *Fiumefreddo v. McLean*, 174 Wis. 2d 10, 26–27, 496 N.W.2d 226 (Ct. App. 1993). We therefore assume a transcript of the trial would support the circuit court's decision to retry the issue of causation as well as negligence, and we affirm this decision without further discussion.

## II. Dismissal of the Fund

¶ 61. The Mankes argue that the circuit court erred in dismissing the Fund because it is possible that they will secure a judgment in an amount in excess of $1,000,000 when costs are added to the $996,967 awarded in the verdict. The premise of the Mankes' argument, as we understand it, is twofold: (1) the high-low agreement is no longer valid to limit damages, because the circuit court held that the agreement did not bar Dr. Hendrickson's motion for a new trial based on extraneous information, and, thus, if the Mankes' prevail in a new trial on negligence and causation, they will be entitled to $996,967 plus costs; and (2) in view of *Ferdon v. Wisconsin Patients Compensation Fund*, 2005 WI 125, ¶ 10, 284 Wis. 2d 573, 701 N.W.2d 440, which holds that the $350,000 cap on non-economic damages in WIS. STAT. § 655.017 and WIS. STAT. § 893.55(4) is unconstitutional, if the Mankes prevail in a new trial on negligence and causation, they will be able to recover the full $650,000 in non-economic damages that the jury awarded.

¶ 62. Neither of the two issues that form the necessary premise to the Mankes' appellate argument was raised in the circuit court. With respect to the high-low agreement, in response to the defense motion for a new trial, the Mankes argued that the court should enforce the agreement. When all parties agreed that

there need be no new trial on damages, neither the Mankes nor any other party raised the issue of whether the high-low agreement would apply to limit damages after a new trial on negligence and causation. When the Fund moved for dismissal, the Mankes objected but did not explain the basis for the objection other than that it was "premature" because the Mankes intended to appeal. Thus, the circuit court never ruled on the issue whether the high-low agreement, although not a bar to a new trial on negligence and causation, would nonetheless apply to limit damages, which will not be retried.

¶ 63. With respect to the applicability of *Ferdon*, that issue was not raised in the circuit court for the obvious reason that *Ferdon* was decided after the Mankes filed this appeal.

¶ 64. Generally, we do not address issues that were not first raised in the circuit court. *See Wirth v. Ehly*, 93 Wis. 2d 433, 443, 287 N.W.2d 140 (1980). We apply that principle here and decline to rule on the applicability of both the high-low agreement and *Ferdon* to the amount of damages the Mankes may recover if they are successful on the retrial of negligence and causation. Because the Mankes' claim of circuit court error in dismissing the Fund is based on two contentions that were never presented to the circuit court and which we decline to address, the Mankes have shown no basis for reversing the order dismissing the Fund. Nothing in our opinion prevents the Mankes from moving the circuit court to reconsider that order for these or other reasons.[19]

---

[19] The Mankes also apparently wish to challenge Wis. Stat. § 655.015 on several constitutional grounds. That statute requires that awards of future medical expenses in excess of

## CONCLUSION

¶ 65. We affirm the circuit court's order setting aside the jury verdict and granting a new trial on the issues of negligence and causation. We also affirm the order dismissing the Fund.

*By the Court.*—Orders affirmed.

$100,000 be paid to the Fund, which is to administer them as prescribed by statute. The Mankes point to nowhere in the record showing that they raised in the circuit court any issue relating to § 655.015. Thus, this is not a basis for reversing the circuit court's order dismissing the Fund, although, as noted above, our opinion does not prevent them from moving the circuit court to reconsider that decision for this reason. We observe that in the Mankes' appellate brief they state that the issue of the constitutionality of § 655.015 is pending in another case in this court. We have since issued a per curiam decision in that case, *Kaul v. St. Mary's Hospital-Ozaukee*, 2005 WI App 214, unpublished slip op. at ¶ 20 (Aug. 31, 2005). We declined in *Kaul* to decide the various constitutional challenges to § 655.015, except to note that the equal protection argument had already been rejected by prior case law.