STATE of Wisconsin, Plaintiff-Appellant,

v.

James D. MILLER, Defendant-Respondent.†

Court of Appeals

*No. 2007AP1052–CR. Submitted on briefs November 2, 2007. —Decided July 2, 2009.*

**2009 WI App 111**

(Also reported in 772 N.W.2d 188.)

† Petition to review denied 12/14/09. Abrahamson, C.J. and Crooks, J., dissents.

724

729

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *William C. Wolford*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *James D. Miller*, pro se.

Before Higginbotham, P.J., Dykman and Vergeront, JJ.

¶ 1. HIGGINBOTHAM, P.J. The State appeals an order vacating James D. Miller's judgment of conviction for first-degree reckless injury while armed with a dangerous weapon, in violation of Wis. Stat. § 940.23(1) (2005–06),[1] and aggravated battery while armed with a dangerous weapon, in violation of Wis. Stat. § 940.19(5). Because we conclude that the evidence was insufficient to convict Miller of first-degree reckless injury, we affirm the trial court's order vacating his conviction on this charge and remand for the trial court to enter a judgment of acquittal. However, we reverse the trial court's decision vacating Miller's conviction for aggravated battery. Accordingly, we modify the trial court's order, and, as modified, affirm in part and reverse in part and remand with directions.

## BACKGROUND

¶ 2. The following facts are taken from trial testimony. One night in January 1999, Calvin Nakai was with two of his cousins at Ella's Bar in Stevens Point. Nakai became intoxicated after drinking many beers and tequila shots. At bar time, Nakai argued with his cousins, who left the bar without him. He received a ride from three people he did not know. The driver stopped at a nearby gas station, and Nakai waited in the car as the others went inside. Nakai testified that he does not remember much of anything that occurred after the gas station.

¶ 3. Inside the gas station, a man and a woman with the group that had given Nakai a ride met James

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

Miller while standing in line. Miller was on his way home from a bar, where he consumed between five and seven beers in the course of four hours. Miller invited the couple back to his trailer for a quick beer. They accepted, and informed Miller that they had another person with them whom they had picked up at the bar. Miller said that was fine, and that he would see them there.

¶ 4. When Miller and his guests met at the trailer, Miller's roommate, Russell Simonis; Russell's cousins, John Simonis and Corey Kesy; and a friend, Josh Lewer, were asleep in the living room. Russell, John and Corey quickly retired to Russell's bedroom. Josh stayed in the living room and slept on the sofa. Miller offered his guests a beer. After about ten minutes, the people Miller met at the convenience store left, leaving Nakai behind with Miller.

¶ 5. Miller and Nakai sat in the living room and talked. Nakai commented on a picture of Miller in uniform, and Miller informed Nakai that he was in the army reserve. Nakai told Miller that he was a marine in the special forces. Nakai, who is Native American, complained about the treatment of Native Americans by whites, and argued that whites should give back the land that was stolen from his ancestors. Miller testified that he just listened to Nakai for some time, but eventually told Nakai that he did not believe that he should be held responsible for what happened to Nakai's ancestors. Nakai responded by drawing closer to Miller and speaking more loudly. Miller told Nakai to settle down, but Nakai grew more argumentative. After about forty-five minutes, Nakai became angry and slapped Miller across the face. Miller testified he pretended this did not happen because he did not want the

732

conflict to escalate. Miller started agreeing with Nakai and tried to change the subject.

¶ 6. But Nakai returned to the topic of Native American grievances, and remained agitated. At one point, Nakai picked up a large screwdriver, and, rolling it in his hand, said to Miller, "Do you know what I could do with this?" Miller responded: "You could probably kill me with it, but you are not going to because you are my friend." Nakai eventually put the screwdriver down.

¶ 7. Miller offered to drive Nakai home, and went out to warm up his car. For the next twenty minutes, Miller tried to persuade Nakai to accept the ride. Nakai refused, insisting that Miller's trailer was his home because it was on land stolen from his ancestors, and slapped Miller again. Miller turned off the car, and offered Nakai a blanket and a pillow so he could sleep on the floor. Nakai told Miller he did not want to go to sleep, and they were going to do what he wanted.

¶ 8. Nakai told Miller he was "going to get [Miller's] little sister" and started walking down the hallway toward the bedrooms.[2] Nakai entered Miller's roommate's bedroom where Russell Simonis and his cousins, John Simonis and Cory Kesy, were sleeping. Russell woke up when Nakai entered the room and, taking cues from Miller who was standing behind Nakai, offered Nakai his bed to sleep in. Nakai yelled at Russell, "Do you know who I am?" Russell responded that he did not, and Nakai smacked him across the face. Russell testified that Nakai said that he was the "Alpha" and the "Omega" and was "quoting the Bible a lot, talking about the beginning and the end." When Russell announced that he needed to use the bathroom, Nakai blocked the doorway and refused to let him pass. Miller

[2] There were no women in the trailer.

testified that Nakai was "pretty much out of control . . . getting more and more violent and going off babbling about crazy things." Miller went to the kitchen and called 911 for help.

¶ 9. Miller told the dispatcher to send at least one officer because Nakai was a big man and was acting crazy. Miller cut the 911 call short after he heard Russell cry "ow, ow!" Miller walked toward the bedrooms and saw Nakai standing over Russell, who was curled up in a ball on the hallway floor. When Russell attempted to get to his feet, Nakai hit him across the back of the head. Raising his voice for the first time, Miller yelled that the police were on the way and ordered Nakai to leave the home. Nakai started shoving Miller, who retreated from the hallway to the kitchen. Nakai followed, and smacked Miller across the face for a third time. Miller continued to demand that Nakai leave the home. By this time, Russell and John were in the kitchen as well, and Nakai declared that this was *his* place and ordered the three men to sit where he told them to. The men refused and told Nakai to leave. Nakai picked up a guitar from the floor and smashed it against an upholstered chair, cracking its neck.

¶ 10. Nakai charged at Miller, swinging his fists. Nakai and Miller exchanged a few quick blows. Nakai and Miller separated, and Nakai grabbed the screwdriver that he had picked up earlier that night. Nakai moved a step or two closer to Miller and, holding the screwdriver in the air, said: "Do you know what I can do with this?" Miller responded that he could probably kill him, and Nakai agreed that he could. Miller moved back behind the kitchen island where Russell and John were standing. Miller testified that he was afraid for his

life, in part because he had heard that marines in the special forces are trained to use everyday objects as lethal weapons.

¶ 11. Miller decided to get a shotgun from his bedroom. He announced that he had to go to the bathroom and that he would be right back. He back-pedalled away from Nakai then took off down the hallway, leaving Nakai with Russell and John. Miller pulled a shotgun off a rack in his bedroom and loaded it with three or four shells. He testified that, at this point, he had not yet decided to shoot Nakai. He said he figured that the gun was the only option to defend himself and Russell and John. He testified that it seemed like twenty or thirty minutes had passed since he had called 911, even though it had in fact been no more than seven or eight minutes.

¶ 12. Miller was gone from the kitchen for approximately thirty to sixty seconds. Miller walked down the hallway toward the kitchen carrying the shotgun. He saw Nakai holding the screwdriver over his head and speaking loudly. Miller could not see Russell or John, and did not know where Corey or Josh were.[3] Miller pumped the shotgun, a sound John testified that he heard in the kitchen. Miller trained the gun on Nakai and yelled: "Get the hell out of here!" Nakai looked at Miller but did not appear to react to the gun or move toward the door. Miller waited three or four seconds, then, aiming for Nakai's left thigh, fired a single shot which entered Nakai's left hip, dropping him to the floor.

---

[3] Both Josh and Corey were in the trailer at the time. However, it appears that neither Josh nor Corey was at the center of the events leading up to the shooting.

¶ 13. Miller testified that his purpose in shooting Nakai was "to stop him," and to prevent him from stabbing Russell and John. While Miller admitted that he intended to shoot Nakai, he testified that he was aiming at Nakai's thigh and not his hip when he fired the shot. Miller kept the gun pointed at Nakai and ran toward the wounded man, ordering him to get out of his house. Miller testified that he believed that Nakai was still a threat.

¶ 14. Miller called 911 again about one minute after the shooting. While talking to the dispatcher, Miller yelled at Russell to keep an eye on Nakai, who was now on the front porch. Miller testified that he called 911 the second time because it seemed like the police should have responded to the first 911 call by then, and because Nakai was bleeding heavily and needed help. Miller was still on the phone with the dispatcher when officers arrived at the trailer. Deputy Sheriff Ronald Ryskoski testified that Miller asked him at the scene if Nakai was going to be all right. Miller admitted to officers that Nakai had not attempted to stab him or Russell or John with the screwdriver, and that Nakai was not standing close enough to stab him when he fired the shot.

¶ 15. Miller was charged with first-degree reckless injury while armed with a dangerous weapon and aggravated battery while armed with a dangerous weapon. At trial, Miller asserted that he acted in self-defense and in defense of Russell and John. The jury was not instructed on any lesser-included offenses. The jury returned a verdict of guilty on both counts, and the court stayed concurrent sentences of four years' imprisonment on each count, and placed Miller on probation for eight years.

¶ 16. In January 2000, Miller's trial counsel moved for a new trial under Wis. Stat. § 809.30 on grounds that the jury was exposed to extraneous prejudicial information during deliberations. The trial court denied the motion, and Miller's trial counsel filed an appeal on Miller's behalf. We affirmed the judgment of conviction in a May 2002 opinion. *State v. Miller*, No. 00–2779–CR, unpublished slip op. (WI App May 23, 2002).

¶ 17. In April 2006, Miller filed a pro se motion for postconviction relief under Wis. Stat. § 974.06. Miller was appointed counsel, who filed an amended § 974.06 motion alleging that the evidence against Miller was insufficient to support the conviction for first-degree reckless injury. The motion also alleged Miller's trial counsel rendered ineffective assistance on several grounds, including: (1) failing to raise the sufficiency of the evidence issue; (2) failing to request a jury instruction on second-degree reckless injury as a lesser-included offense of first-degree reckless injury and aggravated battery; and (3) failing to object when the jury was given the wrong jury instruction on self-defense, Wis JI—Criminal 805, the self-defense instruction for intentional crimes, instead of Wis JI—Criminal 801, the self-defense instruction for crimes of recklessness or negligence.

¶ 18. Following a *Machner*[4] hearing on the ineffective assistance claims, the trial court granted Miller's motion, concluding that trial counsel was ineffective in failing to challenge the sufficiency of the evidence because the evidence did not prove that Miller's conduct showed an "utter disregard for human life," an element

[4] *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

737

of first-degree reckless injury under WIS. STAT. § 940.23. The court also concluded that trial counsel was ineffective in failing to request that the jury be instructed on lesser-included offenses, and in failing to object to the court's use of the wrong jury instruction. The court concluded that the cumulative prejudicial effect of the multiple instances of deficient performance by trial counsel entitled Miller to a new trial and vacated the judgment of conviction on both counts.[5]

## DISCUSSION

¶ 19. The State argues that: (1) Miller's claims are procedurally barred by *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 185–86, 517 N.W.2d 157 (1994); (2) the trial court erred in concluding that, within the context of a claim of ineffective assistance of counsel, the evidence was insufficient to convict Miller of first-degree reckless injury; and (3) the trial court erred in concluding that trial counsel was ineffective for failing to adequately inform Miller of the option to request submission of a jury instruction for second-degree reckless injury, a lesser-included offense of first-degree reckless injury and aggravated battery.[6] Miller makes two arguments that pertain to his conviction for aggravated battery which the trial court did not address; namely, he argues

---

[5] Because the trial court stayed Miller's sentence pending the resolution of his first appeal, Miller did not begin serving his sentence until 2002. Miller was discharged from the State's custody in 2006 after the trial court granted Miller's motion to modify the length of his probation. He has therefore completed his sentence.

[6] We do not address the State's challenge to the trial court's conclusion that trial counsel was ineffective for failing to object to the trial court's omission of a self-defense jury instruction relating to crimes of recklessness, which would have instructed

738

that trial counsel was ineffective for failing to apprise him of the existence of a plea offer, and that the trial court mismanaged jury deliberations.

¶ 20. We address the issues raised in this appeal as follows. In Part I., we conclude that the State has waived its argument that Miller's claims are procedurally barred by *Escalona*. In Part II.A., we conclude that a sufficiency of evidence claim may be raised directly in a WIS. STAT. § 974.06 motion. In Part II.B., we conclude that the evidence was insufficient to convict Miller of first-degree reckless injury, and remand for the court to enter a judgment of acquittal on this count. In Part III., we conclude that, on the aggravated battery count, counsel did not render ineffective assistance with respect to a lesser-included offense instruction for second-degree reckless injury because no reasonable jury would have acquitted Miller of aggravated battery while convicting him of second-degree reckless injury. In Part IV., we conclude that other attacks Miller makes on his aggravated battery conviction that were not addressed by the trial court lack merit.

## I. Escalona

¶ 21. The State raises here for the first time the argument that Miller's appeal is barred by *Escalona-Naranjo*. In *Escalona*, the supreme court interpreted WIS. STAT. § 974.06(4)[7] to prohibit claims of error that could have been raised in the direct appeal or in a

---

the jury to take into account Miller's claims of self-defense in evaluating whether he acted with "utter disregard."

[7] WISCONSIN STAT. § 974.06(4) provides:

All grounds for relief available to a person under this section must be raised in his or her original, supplemental or amended motion. Any ground finally adjudicated or not so raised, or knowingly,

previous motion under § 974.06 from being raised in a subsequent § 974.06 motion absent a sufficient reason for the failure to raise the claims in the earlier proceeding. *Escalona-Naranjo*, 185 Wis. 2d at 185–86.

¶ 22. Miller responds that the State waived its *Escalona* argument by failing to raise it in postconviction proceedings.[8] Miller observes that the State's failure to raise this argument occurred even after he argued in his pro se motion under Wis. Stat. § 974.06 that his claims should not be procedurally barred in anticipation that the State would raise *Escalona*. Miller further argues that, regardless of waiver, he satisfies *Escalona*'s "sufficient reason" requirement because several of the claims raised in the present appeal allege ineffective assistance of trial counsel, and Miller was represented by his trial counsel in his 2000 direct appeal. Miller notes that we held in *State v. Robinson*, 177 Wis. 2d 46, 53, 501 N.W.2d 831 (Ct. App. 1993), and *State v. Hensley*, 221 Wis. 2d 473, 477, 585 N.W.2d 683 (Ct. App. 1998) (stating that *Robinson* was not overturned by *Escalona*), that the inability of trial counsel

voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the person has taken to secure relief may not be the basis for a subsequent motion, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental or amended motion.

[8] The parties use the term waiver in this context. We note that forfeiture is the more appropriate term here. *See State v. Ndina*, 2009 WI 21, ¶¶ 29–30, 315 Wis. 2d 653, 761 N.W.2d 612 (distinguishing forfeiture from waiver, noting that the former is the failure to make the timely assertion of a right, while the latter is the intentional relinquishment or abandonment of a known right). However, because the parties use the term waiver, we use it as well for the sake of readability.

to assert his or her own ineffectiveness in the direct appeal constitutes a sufficient reason under § 974.06(4).

¶ 23. The State does not dispute that it failed to argue that Miller's claims were barred by *Escalona* before the trial court, but argues that we may impose the requirements of *Escalona* against a defendant when the State fails to assert the procedural bar below, citing *State v. Crockett*, 2001 WI App 235, ¶¶ 6–10, 248 Wis. 2d 120, 635 N.W.2d 673. The State further observes that Miller's pro se WIS. STAT. § 974.06 motion addressing *Escalona* was superseded by an amended motion filed by Miller's counsel that did not mention *Escalona*. On the merits, the State argues that the exception to *Escalona* stated in *Robinson* is inapplicable because Miller retained Attorney Robert Henak in addition to his trial counsel, Attorney Maris Rushevics, during the first appeal. Miller responds that Henak was merely an advisor to Rushevics, and was retained only after the trial court denied the postconviction motion, at which point the appellate issues had already been framed.

¶ 24. We conclude that application of the waiver rule is appropriate here, and therefore decline to address the State's *Escalona* argument. Waiver is a rule of judicial administration, and whether we apply the rule is a matter addressed to our discretion. *See Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 417, 405 N.W.2d 354 (Ct. App. 1987). Miller's case differs from *Crockett*, wherein the defendant failed to raise his claim in three prior postconviction motions, and did not assert a sufficient reason for failing to raise his claim in his direct appeal or the prior postconviction proceedings. *Crockett*, 248 Wis. 2d 120, ¶ 10. The present case is more akin to *State v. Avery*, 213 Wis. 2d 228, 247–48, 570 N.W.2d 573

(Ct. App. 1997), in which we concluded that the State had waived its right to assert the procedural bar of *Escalona*. Like Miller, Avery had made no prior WIS. STAT. § 974.06 motions. Moreover, as in Miller's case, the circumstances weighed heavily in favor of reaching the merits. Avery's motion alleged a miscarriage of justice based on the late discovery that the sheriff's department had withheld evidence. Here, Miller's motion asserts claims that he was unable to raise in his direct appeal, as explained below, and alleges that the State failed to meet its burden of proof on his conviction for first-degree reckless injury. For the foregoing reasons, we therefore conclude that the State has waived its argument that Miller's claims are procedurally barred by *Escalona*.[9]

## II. Sufficiency of Evidence Supporting Conviction for First-Degree Reckless Injury

### A. Whether Sufficiency of Evidence May Be Raised Directly in a WIS. STAT. § 974.06 Motion

¶ 25. The State next argues that the trial court erred in concluding that Miller's trial counsel was

---

[9] We are doubtful that the result would be different were we to reach the merits of the State's *Escalona* argument. In *Robinson*, we held that when the defendant is represented by the same counsel both at trial and on appeal, counsel's inability to assert his or her own ineffectiveness constitutes a "sufficient reason" under WIS. STAT. § 974.06. *State v. Robinson*, 177 Wis. 2d 46, 53, 501 N.W.2d 831 (Ct. App. 1993). Here, although Henak advised trial counsel Rushevics regarding the first appeal, Rushevics continued to represent Miller in post-conviction proceedings and before this court. Rushevics was the only attorney on the briefs in Miller's first appeal. *See*

ineffective for failing to adequately challenge the sufficiency of the evidence on the first-degree reckless injury charge. Miller defends the trial court's conclusion that counsel was ineffective in this regard, and further seeks to directly challenge the sufficiency of the evidence in the context of his WIS. STAT. § 974.06 motion. For the reasons stated below, we conclude that Miller may raise his sufficiency of the evidence claim directly in his § 974.06 motion.

██

¶ 26. WISCONSIN STAT. § 974.06 is the primary method by which a defendant may challenge his or her conviction after the time for direct appeal has expired. *See Escalona-Naranjo*, 185 Wis. 2d at 176. A motion under § 974.06 is limited in scope to matters of jurisdiction or constitutional dimension.[10] *Peterson v. State*, 54 Wis. 2d 370, 381, 195 N.W.2d 837 (1972).

¶ 27. The State argues that Miller may not raise a direct claim of insufficient evidence in his WIS. STAT. § 974.06 motion because sufficiency of the evidence is

http://libcd.law.wisc.edu/~wb/will0086/48772445.pdf. Thus, Rushevics would have had to assert his own ineffectiveness to raise the claims brought in this appeal regardless of Henak's assistance. We fail to see how the present case is distinguishable from *Robinson*.

[10] WISCONSIN STAT. § 974.06 provides, as pertinent:

> (1) After the time for appeal or postconviction remedy provided in s. 974.02 has expired, a prisoner in custody under sentence of a court or a person convicted and placed with a volunteers in probation program under s. 973.11 claiming the right to be released upon the ground that the sentence was imposed in violation of the U.S. constitution or the constitution or laws of this state, that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

not a matter of constitutional dimension, citing *Peterson*, 54 Wis. 2d at 381. In *Peterson*, after observing that a § 974.06 motion is limited in scope to matters of jurisdictional and constitutional dimension, the supreme court said: "Such issues as sufficiency of the evidence, jury instructions, error in admission of evidence and other procedural errors cannot be reached by a sec. 974.06 motion." *Id.* (footnote omitted). The supreme court has repeatedly cited *Peterson*'s statement that sufficiency of evidence claims may not be raised in a § 974.06 motion when discussing the scope of the statute, most recently in *State v. Evans*, 2004 WI 84, ¶ 33, 273 Wis. 2d 192, 682 N.W.2d 784, *overruled on other grounds, State ex rel. Coleman v. McCaughtry*, 2006 WI 49, ¶¶ 19–29, 290 Wis. 2d 352, 714 N.W.2d 900. *See also State v. Lo*, 2003 WI 107, ¶ 24, 264 Wis. 2d 1, 665 N.W.2d 756; *State v. Carter*, 131 Wis. 2d 69, 81, 389 N.W.2d 1 (1986); and *State v. Walberg*, 109 Wis. 2d 96, 103, 325 N.W.2d 687 (1982). However, in none of these cases did the issue pertain to whether a sufficiency of the evidence claim could be raised in a § 974.06 motion. The court's citation of *Peterson* in these cases was for the limited purpose of providing legal background about the scope of a motion under § 974.06.

¶ 28. Despite the above-cited language in *Peterson, et al.,* other decisions of our supreme court and the United States Supreme Court issued after *Peterson* persuade us that a sufficiency of the evidence challenge may be raised directly in a WIS. STAT. § 974.06 motion because such a claim is a matter of constitutional dimension. Discussing *In re Winship*, 397 U.S. 358, 364 (1970), the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 316 (1979), declared that

an essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient ... evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

Citing *Winship* and *Jackson*, our supreme court recognized in *State v. Ivy*, 119 Wis. 2d 591, 608, 350 N.W.2d 622 (1984), that sufficiency of the evidence claims are grounded in the due process guarantees of the Fourteenth Amendment. The issue presented in *Ivy* was whether this court was required to address sufficiency of the evidence claims when the case presented other grounds for reversal. *Ivy* held that this court must address a claim of sufficiency of evidence in such a case because the Double Jeopardy Clause of the Fifth Amendment precludes retrial when the evidence is insufficient, citing *Burks v. United States*, 437 U.S. 1, 18 (1978). *Ivy*, 119 Wis. 2d at 608–11.

¶ 29. While *Ivy* arose on a direct appeal under WIS. STAT. § 974.02, and therefore did not address the scope of § 974.06, the principle stated in *Ivy*—that a sufficiency of the evidence claim implicates the due process guarantee of the United States Constitution—implicitly overruled the premise in *Peterson* that sufficiency of the evidence is not a constitutional claim. More recently in *State v. Hayes*, 2004 WI 80, 273 Wis. 2d 1, 681 N.W.2d 203, the court concluded that a sufficiency of the evidence claim is not waived when the defendant fails to raise the claim before the trial court. While the majority came to this conclusion based on its interpretation of WIS. STAT. § 974.02, three justices did so based in part on the recognition that such claims "go[] to the heart of a determination of guilt in a criminal trial." *Hayes*, 273 Wis. 2d 1, ¶¶ 4, 48

(Abrahamson, C.J., joined by Bradley and Crooks, JJ.). In addition, a fourth justice in a concurrence explained that claims of insufficient evidence should not be deemed waived when first raised in a direct appeal because such claims are "bottomed in . . . the fundamental constitutional principle that a defendant is presumed innocent until the State proves him or her guilty by that requisite degree of proof." *Id.*, ¶ 118 (Roggensack, J., concurring).

¶ 30. In light of these more recent constitutional developments, we must conclude that language in *Peterson* to the effect that sufficiency of the evidence claims lack constitutional dimension and therefore may not be raised in a WIS. STAT. § 974.06 motion has been superseded. We therefore directly address Miller's claim that the evidence was insufficient to support his conviction for first-degree reckless injury.

### B. Whether the Evidence was Sufficient to Convict Miller of First-Degree Reckless Injury

██

¶ 31. We must uphold Miller's conviction "unless the evidence is so insufficient in probative value and force that as a matter of law, no reasonable fact finder could have determined guilt beyond a reasonable doubt." *State v. Jensen*, 2000 WI 84, ¶ 23, 236 Wis. 2d 521, 613 N.W.2d 170. This test requires us to view the evidence in the light most favorable to the conviction. *Id.* Whether the evidence is sufficient to support the conviction is a question of law that we review de novo. *State v. Booker*, 2006 WI 79, ¶ 12, 292 Wis. 2d 43, 717 N.W.2d 676.

¶ 32. Miller's attack on his conviction for first-degree reckless injury turns on whether the evidence was sufficient to prove that he acted with "utter disregard for human life." Both first- and second-degree reckless injury require proof of reckless conduct causing great bodily harm. WIS. STAT. § 940.23.[11] First-degree reckless injury includes an aggravating element, proof that the perpetrator acted with "utter disregard for human life." *Id.* The phrase "utter disregard for human life" has the same meaning as "depraved mind, regardless of life," the former language used in the Wisconsin code until 1987 to denote the aggravating element in crimes of recklessness. *Jensen*, 236 Wis. 2d 521, ¶ 18 (citations omitted).

¶ 33. Utter disregard requires "more than a high degree of negligence or recklessness." *Wagner v. State*, 76 Wis. 2d 30, 46, 250 N.W.2d 331 (1977) (citation omitted). To evince utter disregard, "[t]he mind must not only disregard the safety of another but be devoid of regard for the life of another. A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment." *Id.* (citation omitted). A person acting with utter disregard must possess "a state of mind which has no regard for the moral or social duties of a

---

[11] WISCONSIN STAT. § 940.23 provides, in pertinent part:

(1) FIRST-DEGREE RECKLESS INJURY. (a) Whoever recklessly causes great bodily harm to another human being under circumstances which show utter disregard for human life is guilty of a Class D felony.

. . . .

(2)(a) SECOND-DEGREE RECKLESS INJURY. Whoever recklessly causes great bodily harm to another human being is guilty of a Class F felony.

human being." *Wagner*, 76 Wis. 2d at 45 (citing *State v. Weso*, 60 Wis. 2d 404, 410, 210 N.W.2d 442 (1973)).

¶ 34. "Utter disregard is proved through an examination of the act, or acts, that caused [injury] and the totality of the circumstances that surrounded that conduct." *State v. Edmunds*, 229 Wis. 2d 67, 77, 598 N.W.2d 290 (Ct. App. 1999). In evaluating whether there is sufficient proof of utter disregard for human life, we consider many factors, including

> the type of act, its nature, why the perpetrator acted as he/she did, the extent of the victim's injuries and the degree of force that was required to cause those injuries. We also consider the type of victim, the victim's age, vulnerability, fragility, and relationship to the perpetrator. And finally, we consider whether the totality of the circumstances showed any regard for the victim's life.

*Jensen*, 236 Wis. 2d 521, ¶ 24 (quoting *Edmunds*, 229 Wis. 2d at 77).

¶ 35. We are aware of no Wisconsin cases challenging the sufficiency of evidence to prove "utter disregard" or "depraved mind" that have arisen on facts similar to those of the present case. Miller cites *Wagner* and *Balistreri v. State*, 83 Wis. 2d 440, 265 N.W.2d 290 (1978), cases involving crimes related to the reckless use of an automobile, wherein the court concluded that the evidence was insufficient to prove that the defendants acted with a depraved mind where the defendants swerved at the last minute to avoid an accident. The State cites *Jensen*, a "shaken-baby" case in which the court concluded that the evidence of abuse was sufficient to prove that the defendant acted with utter disregard. *Jensen*, 236 Wis. 2d 521, ¶ 25; *see also Edmunds*, 229 Wis. 2d at 77–78 ("shaken-baby" case reject-

748

ing challenge of sufficiency of the evidence showing utter disregard). However, it is difficult to draw conclusions about whether Miller's conduct evinced utter disregard by resort to any of these cases because the circumstances of these cases are dissimilar to the present case.[12]

¶ 36. The State calls our attention to *State v. Bernal*, 111 Wis. 2d 280, 330 N.W.2d 219 (Ct. App. 1983). Like Miller's case, *Bernal* involved the discharge of a firearm. However, that is where the similarities between *Bernal* and the present case end. In *Bernal*, the defendant walked into a bar with a loaded handgun, saw his wife at the bar with another man, and intentionally shot his wife in the back. The wife's male friend charged Bernal, and Bernal discharged his weapon, killing the man. We concluded that the evidence in Bernal's conviction for killing the man was sufficient to conclude that Bernal had acted with utter disregard for human life. *Bernal*, 111 Wis. 2d at 284–85.

¶ 37. We wrote in *Bernal* that

[i]ntentionally pointing a loaded gun ready to shoot at another person is conduct imminently dangerous to another. Unless it is privileged or otherwise defensible,

---

[12] For this reason, we reject the State's suggestion that *Wagner, Balistreri* and *Jensen* may be read to stand for the proposition that evidence of "after-the-fact" regard for life is of less import than conduct evincing regard for life during and before the act. Courts consider the totality of the circumstances when determining whether the defendant showed some regard for life, which may include conduct occurring before, during and after the commission of the criminally reckless act itself. *See State v. Jensen*, 2000 WI 84, ¶ 32, 236 Wis. 2d 521, 613 N.W.2d 170; *State v. Olson*, 75 Wis. 2d 575, 582, 250 N.W.2d 12 (1977); *State v. Edmunds*, 229 Wis. 2d 67, 78, 598 N.W.2d 290 (Ct. App. 1999).

the act evinces a depraved mind, regardless of human life, whether the person holding the weapon intends to frighten, intimidate or stop the other person and does not intend to shoot.

*Bernal,* 111 Wis. 2d at 285. The State argues that because Miller pointed the loaded shotgun at Nakai, and the jury rejected Miller's claim of privilege, i.e. self-defense and defense of others, *Bernal* compels the result in this case. We disagree. *Bernal* states that pointing a loaded gun at another is not conduct evincing a depraved mind (utter disregard) if it is "otherwise defensible," even if it is not privileged. As the analysis below demonstrates, whether Miller's conduct was "otherwise defensible" is very much at issue in this case. Moreover, to the extent that *Bernal* might appear to establish a *per se* rule, we note that the supreme court has carefully avoided *per se* rules in this area and instead has consistently applied a totality of the circumstances approach to the cases.

¶ 38. Lacking cases from which we might reach a conclusion by analogy, we subject the facts of this case to the multi-factored test for determining utter disregard set forth in *Jensen*.

¶ 39. Applying *Jensen*, we observe that the type and nature of the act, the extent of Nakai's injuries and the degree of force used support a conclusion that Miller acted with utter disregard. Miller fired a shotgun at a person from a range of sixteen to eighteen feet, causing great bodily harm to Nakai and exposing Nakai to an extreme risk that could have caused Nakai's death. However, the remaining factors set forth in *Jensen*, including principally the reason for Miller's conduct, persuade us that the evidence was insufficient

750

for a reasonable jury to conclude that Miller acted with utter disregard for human life. While Miller's conduct may have been reckless under Wis. Stat. § 940.23, under no reasonable view did Miller's conduct evince an utter disregard for human life within the meaning of § 940.23(1).

¶ 40. Miller's uncontroverted testimony was that Nakai, a guest in Miller's home, was violent and belligerent toward Miller and his friends throughout the course of several hours. Miller testified that he offered to give Nakai a ride home, and when Nakai refused to leave, insisting that this was "his place," Miller got Nakai a blanket and pillow to sleep on the floor. Nakai, who informed Miller that he was a marine in the special forces, threatened to kill Miller with a screwdriver. Later, waiving the screwdriver over his head, Nakai threatened to kill Miller, Russell and John. Miller shot Nakai only after Nakai made these threats, and only after Nakai had attacked Miller, Russell and John at other times during the night. While the jury rejected Miller's claim of self-defense and defense of others under Wis. Stat. § 939.48, the prosecutor acknowledged in his closing argument that Miller "was acting in self-defense, but he wasn't acting in lawful self-defense." It would appear undisputed that a reason, if not *the* reason, for Miller's conduct was to protect himself and his friends. This reason is inconsistent with conduct evincing utter disregard. *See Seidler v. State*, 64 Wis. 2d 456, 465–66, 219 N.W.2d 320 (1974) ("depravity of mind exists when the conduct causing [injury] demonstrates an utter lack of concern for the life and safety of another *and for which conduct there is no justification or excuse*") (emphasis added).

¶ 41. Additionally, Nakai was not a blameless or vulnerable victim. *See Jensen*, 236 Wis. 2d 521, ¶ 24

751

(victim's age, vulnerability, fragility, and relationship to the perpetrator relevant to utter disregard analysis). It was established that Nakai was a larger man than Miller and his friends, and informed Miller that he was a marine in the special forces. Nakai was belligerent toward Miller throughout the night, and refused to leave the trailer when asked repeatedly, insisting that the trailer was his home. Nakai could have left but instead escalated the confrontation with Miller and his friends, threatening them with the screwdriver.

¶ 42. Finally, Miller showed some regard for human life under the totality of the circumstances. Miller did not engage Nakai physically for the first several hours, even after Nakai struck Miller. Miller offered to give Nakai a ride home and got a blanket and pillow for him to sleep on the floor. Before the shooting, Miller called 911 as the situation with Nakai began to escalate, and shot Nakai only when Nakai continued to threaten Russell and John with the screwdriver. Moments after firing the shot, Miller called 911 to report the shooting, and later asked an officer whether Nakai was going to be okay.

¶ 43. We note that Miller's testimony was uncontroverted, and was remarkably consistent with his initial statements to investigators and with the testimony and statements of the other witnesses. It was also largely consistent with the physical evidence. We do not believe that the evidence reasonably supports competing inferences so contrary to Miller's testimony as to support a reasonable conclusion that Miller acted with utter disregard for human life.[13] While the evidence

---

[13] The dissent maintains that the evidence, when viewed in the light most favorable to the verdict, raises reasonable inferences from which a reasonable jury could find that Miller acted

supports a reasonable conclusion that his conduct was criminally reckless, it cannot reasonably be read to support a view that Miller's state of mind was such that he showed "no regard for the moral or social duties of a human being." *Weso*, 60 Wis. 2d at 410.

¶ 44. For the foregoing reasons, we therefore conclude that the evidence, viewed in the light most favorable to the conviction, demonstrates that Miller showed some regard for human life. Accordingly, we modify the trial court's order of a new trial on the charge of first-degree reckless injury and remand for the court to enter a judgment of acquittal. *See Ivy*, 119 Wis. 2d at 608–609 (explaining that when an appellate court determines that the evidence was insufficient to

---

with utter disregard when he shot Nakai. For example, the dissent points to evidence that suggests Miller may have egged-on Nakai, and that Miller, perhaps unsurprisingly, was angry with Nakai when firing the shots. At most, the dissent succeeds in showing that the facts may be more complicated than Miller suggests. However, the dissent fails to persuade us that the cumulative weight of the negative inferences, viewed in the light most favorable to the jury's verdict, support the view that Miller acted with utter disregard. Even if the jury disbelieved Miller's testimony in its entirety—a difficult proposition because Miller's testimony was largely uncontroverted and, at least in its broad outlines, was the only version of events presented to the jury—the fact that Miller called 911 for police assistance twice and the officer's testimony that Miller asked whether Nakai was going to be alright show that Miller evinced some regard for human life. Utter disregard, as noted above, describes a state of mind that is "devoid of regard for the life of another . . . lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment." *Wagner v. State,* 76 Wis. 2d 30, 46, 250 N.W.2d 331 (1977). To conclude that a jury could reasonably find utter disregard on the facts of this case would represent an expansion of the aggravating factor in crimes of recklessness. Simply put, this is not an "utter disregard" case.

support a conviction the remedy is to order a judgment of acquittal, citing *Burks*, 437 U.S. at 18).

### III. *Ineffective Assistance With Respect to an Instruction on Lesser-Included Offense of Second-Degree Reckless Injury to Aggravated Battery*

¶ 45. After hearing testimony from Miller and his trial counsel at the *Machner* hearing, the trial court found that trial counsel inadequately discussed with Miller the option to request submission of a jury instruction for second-degree reckless injury, WIS. STAT. § 940.23(2)(a),[14] a lesser-included offense of aggravated battery, WIS. STAT. § 940.19(5).[15] The court concluded that this constituted deficient performance and that "it appears that Miller was prejudiced" by this deficient performance.[16]

¶ 46. The State challenges the court's conclusion of ineffective assistance of counsel on several grounds, one of which is that Miller was not entitled to an instruction on second-degree reckless injury because

---

[14] Second-degree reckless injury is defined as "recklessly caus[ing] great bodily harm to another human being . . . ." WIS. STAT. § 940.23(2)(a).

[15] WISCONSIN STAT. § 940.19(5) provides that "[w]hoever causes great bodily harm to another by an act done with intent to cause great bodily harm to that person or another is guilty of a Class E felony."

[16] The circuit court made the same findings and conclusions regarding second-degree reckless injury as a lesser-included offense of first-degree reckless injury. However, we do not address that issue in the majority opinion because we have concluded that Miller is entitled to a judgment of acquittal on the first-degree reckless injury charge.

the evidence does not reasonably support an acquittal on the aggravated battery charge and a conviction on second-degree reckless injury. Although Miller contends that trial counsel was deficient both for not discussing a lesser-included offense instruction with him and for not requesting one, the premise of both arguments, as we understand them, is that he was entitled to the instruction based on the evidence. Because we agree with the State that the evidence does not reasonably support an acquittal on the greater charge and a conviction on the lesser charge, we conclude trial counsel was not deficient and we do not address the parties' other arguments. *See State v. Van Straten*, 140 Wis. 2d 306, 320, 409 N.W.2d 448 (Ct. App. 1987) (rejecting defendant's claim that counsel was ineffective for failing to consult with him on a lesser-included offense instruction and failing to request such an instruction because the evidence did not support the instruction).

¶ 47. A claim of ineffective assistance of counsel requires proof that counsel's performance was deficient and that the deficiencies prejudiced the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). In reviewing the trial court's determination of deficient performance, we will uphold the trial court's factual findings unless clearly erroneous, and subject its conclusion that counsel's performance was constitutionally deficient to de novo review. *See State v. Doss*, 2008 WI 93, ¶ 23, 312 Wis. 2d 570, 754 N.W.2d 150.

¶ 48. A criminal defendant is entitled to a lesser-included offense instruction if requested when reasonable grounds exist in the evidence both for acquittal on

the greater offense and conviction on the lesser offense. *State v. Foster*, 191 Wis. 2d 14, 23, 528 N.W.2d 22 (Ct. App. 1995).

¶ 49. The elements of the crime of aggravated battery as applied to this case are: (1) Miller caused great bodily harm to Nakai; and (2) Miller intended to cause great bodily harm to Nakai. WIS JI—CRIMINAL 1224. The elements of the crime of second-degree reckless injury as applied here are: (1) Miller caused great bodily harm to Nakai; and (2) Miller caused great bodily harm by criminally reckless conduct. WIS JI—CRIMINAL 1252.[17]

¶ 50. As the State notes, the jury heard a stipulation that Nakai sustained "great bodily harm" as a result of the shooting, satisfying the first element of aggravated battery. With regard to the second element, the State observes that Miller, by his own admission, intended to shoot Nakai in the thigh at a range of no more than eighteen feet with a shotgun. The State argues that, as a matter of law, such conduct demonstrates intent to cause great bodily harm, fulfilling the second element of the crime of aggravated battery. Miller maintains that a reasonable jury could conclude, based on the fact that he fired the gun at Nakai's thigh and not his vital organs, and on testimony that his purpose in shooting Nakai was "to stop him," that he did not intend to cause Nakai great bodily harm.

¶ 51. "Great bodily harm" is defined in the Wisconsin statutes as "bodily injury which creates a substantial risk of death, or which causes serious permanent disfigurement, or which causes a permanent or

---

[17] The State does not contend that second-degree reckless injury is not a lesser-included offense of aggravated battery. We therefore assume that it is for purposes of this discussion.

protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury." Wis. Stat. § 939.22(14). A person acting with criminal intent "either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Wis. Stat. § 939.23(3).

¶ 52. We conclude as a matter of law that shooting a person in the thigh at a range of sixteen to eighteen feet with a shotgun is practically certain to cause at least a protracted loss or impairment of the function of the person's leg, and is therefore injury constituting "great bodily harm" within the meaning of the statutes. In so concluding, we reject Miller's argument that, by aiming for Nakai's thigh and not his abdomen, chest or head, a reasonable jury could conclude that he did not intend to cause Nakai great bodily harm.

¶ 53. We further conclude that Miller, who had experience with firearms as an army reservist and a hunter, would have been aware that his conduct was practically certain to cause protracted loss or impairment of function of Nakai's leg. We reject Miller's argument that a reasonable jury could have concluded that Miller did not intend to cause Nakai great bodily harm based on his testimony that his purpose in shooting Nakai was "to stop him." The fact that Miller's conduct was intended to neutralize the threat posed by Nakai does not negate the fact that, by firing the shotgun at Nakai's thigh, Miller also intended to cause Nakai great bodily harm by committing an act that he was aware was practically certain to result in great bodily harm to Nakai.

757

¶ 54. We conclude that, because the only reasonable view of the evidence is that Miller intended to cause Nakai "great bodily harm" as defined in WIS. STAT. § 939.22(14), no reasonable jury could have acquitted Miller of aggravated battery unless it accepted his defense of self-defense or defense of others. However, if a reasonable jury did accept one of those defenses, it would also acquit Miller of second-degree reckless injury. Thus, there is no reasonable basis in the evidence for an acquittal on the aggravated battery charge and a conviction on the second-degree reckless injury charge. Accordingly, Miller was not entitled to a lesser-included instruction for second-degree reckless injury for this charge.

## IV. Additional Challenges Pertaining to the Conviction for Aggravated Battery

¶ 55. The trial court's remaining bases for concluding that Miller was denied the effective assistance of counsel pertain only to the first-degree reckless injury charge. We have rejected the only basis on which the trial court vacated Miller's conviction for aggravated battery, which was that trial counsel was ineffective with respect to an instruction on the lesser-included offense. However, Miller makes arguments which the trial court did not address concerning counsel's failure to inform him of a plea offer and alleged mismanagement of jury deliberations by the trial court that pertain to his conviction for aggravated battery. We address these arguments in turn.

¶ 56. First, Miller argues that trial counsel rendered ineffective assistance in failing to apprise Miller of the existence of a plea offer. The trial court concluded

that, while counsel's performance was deficient in this regard, Miller was not prejudiced by counsel's error because Miller testified at the *Machner* hearing that he probably would not have taken the offer had he been informed of it. Based on this testimony, we likewise conclude that trial counsel's failure to apprise Miller of the plea offer was not prejudicial and therefore reject this argument.

¶ 57. Second, Miller makes a set of arguments that concern alleged mismanagement of jury deliberations by the trial court, ineffective assistance for counsel's failure to object to the alleged mismanagement of the jury, and an allegation that a juror changed his vote to "guilty" to end jury deliberations so that he could leave for a fishing trip. The relevant facts of these claims are as follows. The court informed the jury at the outset that the trial was expected to last two days. When, at the end of the second day, it became clear that the trial would run long, the court asked jurors if they would be able to return the following day. One juror informed the court that he had planned to leave town the following day at 3:00 p.m. for an annual fishing trip. The court advised the juror that the case would likely be sent to the jury by noon. As it happened, the case did not go to the jury until 4:12 p.m., and the jury returned a guilty verdict at approximately 8:30 that night. Miller avers in an affidavit accompanying his WIS. STAT. § 974.06 motion that the fishing-trip juror later told an investigator that he switched his vote from "innocent" to "guilty" to end jury deliberations so that he could leave for the trip.

¶ 58. On appeal, Miller contends that the trial court's decision to convene the jury despite being informed of the juror's fishing trip violated rules of judicial administration set forth in Supreme Court Rule (SCR)

73.03[18] regarding management of a jury, and that this error was not harmless. He also contends that trial counsel was ineffective for not objecting to the court's failure to question the jurors before requiring them to deliberate in light of one juror's known scheduling conflict. Finally, he argues that the fishing-trip juror incident deprived him of his right to due process and a twelve-person jury trial, entitling him to a new trial.

¶ 59. The State responds that Miller's argument to the trial court concerned only the juror's statement that he changed his vote to "guilty" and not the court's alleged violation of SCR 73.03, and therefore Miller has waived any argument based on the supreme court rules. We observe, however, that Miller raised his argument under SCR 73.03 in his initial pro se brief to the trial court. We therefore reject the State's claim of waiver.

¶ 60. Assuming for argument's sake that the court's actions violated SCR 73.03, Miller provides no authority for the proposition that a court's violation of a supreme court rule may, alone, be grounds for reversal of a criminal conviction, and we decline to adopt

---

[18] Wisconsin Supreme Court Rule 73.03 provides, as pertinent:

(1) Jury deliberations shall take place under conditions and pursuant to procedures that are designed to maintain impartiality and to enhance rational decision making.

(2) The judge shall instruct the jury concerning appropriate procedures to be followed during deliberations.

. . . .

(4) The judge shall determine, after considering the needs of the jury, the parties and the court system, whether a jury will deliberate after normal working hours.

such a rule here.[19] *Cf. Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) (court of appeals is primarily an error-correcting court). In supplemental authority, Miller cites *State v. Ruiz-Velez*, 2008 WI App 169, ¶ 6, 314 Wis. 2d 724, 762 N.W.2d 449, which addressed SCR 71.01(2), requiring the reporting of all proceedings in circuit court, in reversing a court order denying the transcription of an audiovisual recording of a child victim in a sexual assault case. However, *Ruiz-Velez* concluded that the circuit court's denial violated WIS. STAT. RULE 908.08, requiring the reporting of videotaped testimony presented at trial. This court's brief discussion of SCR 71.01(2) in *Ruiz-Velez*, which concluded that the circuit court's action violated the rule, followed our conclusion that the circuit court violated RULE 908.08, and was offered merely to "reinforc[e] our analysis." *Ruiz-Velez* therefore does not persuade us that, even if a violation of SCR 71.01(2) occurred, reversal of Miller's conviction would be warranted.

¶ 61. With regard to Miller's argument that counsel was ineffective for not objecting to the trial court's failure to question the jurors before ordering them to deliberate, we conclude that Miller has failed to demonstrate that his counsel's performance was deficient. The court had the following exchange with the juror about the fishing trip:

Court: And what is your situation, sir?

---

[19] We distinguish a supreme court rule from rules adopted by the supreme court pursuant to its authority to adopt procedural rules codified in the Wisconsin statutes. *See, e.g.* WIS. STAT. RULE 801.02 (rules for commencing an action); WIS. STAT. RULE 801.17 (electronic filing rules); WIS. STAT. RULE 802.02 (pleading rules).

Juror: I have a sturgeon fishing trip planned for tomorrow, but I can wait. It all depends how long. I was planning to leave by 3:00.

Court: All right. I would think that that's—We would still be fairly close. We should be done before that, but I don't know how long you would be deliberating, obviously, so when you say a "planned sturgeon trip," this is something that you paid for, or you have planned for some time?

Juror: It's a yearly thing, but I can wait.

We conclude that the court's colloquy with the juror was sufficient to satisfy the requirements of due process. The juror assured the court that he could wait on the fishing trip after the court had explained that it was not certain how long deliberations might run. Given these assurances, the court was not required as a matter of due process to make a further inquiry of the juror the following afternoon before giving the case to the jury. The lack of an objection was therefore not deficient performance.

¶ 62. Finally, we consider Miller's argument that he is entitled to a new trial based on allegations contained in an affidavit in which Miller avers that the fishing-trip juror told an investigator hired by Miller that he changed his vote to "guilty" to end jury deliberations so that he could leave for his fishing trip. WISCONSIN STAT. § 906.06(2) provides that a juror may not provide testimony in an inquiry into the validity of a verdict "except . . . on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." To be entitled to an evidentiary hearing inquiring into the

762

validity of a verdict, the party seeking to set aside a verdict on grounds of extraneous prejudicial information or outside influence must make a preliminary showing by affidavit or nonjuror evidence. *Manke v. Physicians Ins. Co. of Wis., Inc.*, 2006 WI App 50, ¶ 25, 289 Wis. 2d 750, 712 N.W.2d 40. The affidavit or nonjuror evidence must demonstrate that "the subject matter of the proposed hearing is within an exception to Wis. Stat. § 906.06(2) and must assert facts that, if true, would require a new trial." *Id.* Whether the affidavit in this case meets this legal standard is a question of law, which we review de novo. *Id.* at ¶ 19.

¶ 63. We conclude Miller's affidavit fails to allege facts that would entitle him to an evidentiary hearing inquiring into the validity of the verdict, let alone entitle him to a new trial. Miller claims that the fishing-trip juror's "impending departure for his annual trip, and no doubt the chiding he could expect from his buddies," was an outside influence improperly brought to bear upon the juror. We conclude that the scheduled fishing trip, and any criticism the juror might expect to receive from his fishing buddies for missing the trip, was not, as a matter of law, an "outside influence" within the meaning of Wis. Stat. § 906.06(2).

## CONCLUSION

¶ 64. In sum, we conclude that the evidence was insufficient to convict Miller of first-degree reckless injury. However, we conclude that the trial court erred in vacating Miller's conviction for aggravated battery. Accordingly, we modify the trial court's order for a new trial on the conviction for first-degree reckless injury and remand for the trial court to enter a judgment of

acquittal, and we reverse that portion of the trial court's order vacating Miller's conviction for aggravated battery.

*By the Court.*—Order modified, and as modified, affirmed in part; reversed in part and cause remanded with directions.

¶ 65. VERGERONT, J. (*dissenting in part*). I write separately because I conclude there was sufficient evidence to convict Miller of first-degree reckless injury. I therefore respectfully dissent from Part II.B. of the majority opinion.

¶ 66. Because I do not agree that Miller is entitled to an acquittal on this charge, I address his request for a new trial on this charge based on ineffective assistance of counsel. I conclude he received effective assistance of counsel. Were I writing for the majority I would reverse the circuit court's order for a new trial on first-degree reckless injury and affirm the judgment of conviction.

I. Sufficiency of Evidence—First-Degree Reckless Injury

¶ 67. I conclude that, if the evidence is viewed in the light most favorable to the verdict, it is sufficient to support a conviction for first-degree reckless injury, and, in particular, is sufficient to find beyond a reasonable doubt that Miller showed utter disregard for human life. In my opinion the majority's recitation of the facts is not a view of the evidence most favorable to the verdict. It relies primarily on Miller's testimony on direct examination and portions of his roommate's and his roommate's cousin's testimony that are consistent with Miller's testimony. The majority does not examine

inconsistencies in the testimony or inconsistencies between the trial testimony and prior statements, and it does not draw all reasonable inferences from the evidence in favor of the verdict.

¶ 68. I will focus on the events beginning with Miller's first call to 911 because I think a reasonable jury would view those as most important. But I first note examples of evidence not mentioned by the majority opinion that could cause a reasonable jury to believe that at trial Miller, Russell Simonis, and John Simonis were overstating Nakai's aggressiveness and understating their own part in the altercations leading up to the first 911 call. For example, John testified on cross-examination that he was awakened by Miller shaking him awake and yelling his name saying "[o]h, you can just mess with him a little bit," meaning that Miller was telling Nakai that Nakai could mess with John. According to John, that is when Nakai said "I'm going to kick your ass"; but he, John, did not want to play along with it and said "[y]eah, go ahead. Kick my ass. I'm going back to sleep," and Nakai left him alone. A reasonable jury could infer from this and other evidence that Miller knew that Nakai was extremely intoxicated and was egging Nakai on, at least in the beginning.

¶ 69. Another example is that, while Russell testified at trial that Nakai slapped him in the bedroom, a reasonable jury could find this less credible than the statement Russell gave soon after the event in which he did not mention being slapped, but instead said Nakai might have grabbed his wrist and tried "like twisting it," saying "[w]ill you listen to me when I'm talking to you." Although John corroborated Russell's trial testimony, John also testified that his and Kesey's reaction was to laugh at the interaction.

765

¶ 70. Turning to what occurred after Miller called 911 the first time, I note that, based on his statements to an investigating officer soon after the incident, Miller was really angry when he went back to the hallway and he pulled Nakai away from Russell, striking Nakai several times. Miller was surprised to see how easy it was for him to strike and take control of Nakai, and, he stated, that probably had something to do with Nakai's consumption of alcohol. A reasonable jury could credit this statement rather than Miller's trial testimony, which the majority recites, and could decide that Miller, not Nakai, had the upper hand.

¶ 71. Both John and Russell agree that Russell, having taken his shirt off, went to get John and said "[h]ey, get out here. We're going to kick his ass," and both went to the kitchen, where Miller was with Nakai. It was just after John and Russell came into the kitchen that Nakai picked up the screwdriver. According to Miller's statements to the investigating officer, at this point Nakai was on one side of a table and an island in the kitchen and the other three were on the other side. According to Russell's testimony on cross-examination and Miller's testimony, Nakai never said he was going to kill them with the screwdriver. Nakai said, "Do you know what I can do with this?" Miller said, "[y]eah, you could probably kill us," and Nakai answered, "[y]eah, that's right." John, Russell, and Miller all agreed that at no time did Nakai lunge at any of them with the screwdriver or attempt to stab any of them with the screwdriver. John described Nakai's motion with the screwdriver as "moving it from side to side . . . with his full arm." Miller described Nakai as moving his wrist from side to side and agreed Nakai made no stabbing or sharp, jerky motions with it. A reasonable inference from this evidence, drawn in favor of the verdict, is that

Nakai picked up the screwdriver to defend himself against three other people, one of whom had just said they were going to "kick his ass."

¶ 72. A reasonable jury could also decide that it was evident to Miller that Nakai was having difficulty moving because he was so intoxicated. Evidence supporting this reasonable inference is Miller's statement to the officer, referred to in paragraph 5, and Russell's testimony that in the kitchen Nakai was stumbling, fell down a couple times, and used the table and counter for support.[1] Russell told the investigating officer that Nakai was intoxicated "beyond oblivion."

¶ 73. Miller testified that, when Nakai picked up the screwdriver, Miller decided he was going to get his shotgun from his bedroom. Miller, John, and Russell all agreed that Nakai did not stop Miller when he said he was going to the bathroom and left the kitchen. Miller told the investigating officer that no one was being threatened at that time. Miller looked back once when he was going down the hall to his bedroom and could see only Nakai, and only his back, not his whole body. Miller acknowledged that while he was in the bedroom getting his gun and loading it with .12 gauge shells, he could not hear what was being said in the kitchen, just noise. John testified that neither he nor Russell called to Miller for help after Miller left the kitchen.

¶ 74. Miller testified on cross-examination that, as he walked out of the bedroom with the gun loaded, he told Nakai to get the "F" out of his house and then he

---

[1] Russell was describing how Nakai was moving immediately after Miller left the kitchen, and, thus, Miller would not have seen these precise movements. However, a reasonable jury could infer that Nakai was having the same difficulty walking steadily and maintaining his balance before Miller left the kitchen and that Miller saw this.

pumped his gun while he was still moving. He stopped while still in the hallway and leveled the gun at Nakai; he could see that Nakai was still in the same general area as when Miller had left the kitchen and that he was not lunging at anyone. He could see only Nakai; he did not know where Russell and John were. The investigating officer testified that from the location in the hallway where the evidence, in his view, showed Miller was standing when he pulled the trigger, Miller could not see whether anyone in the kitchen was in harm's way. According to the investigating officer, Miller was about sixteen or seventeen feet away from Nakai when he pulled the trigger. Miller never told the officer that he shot Nakai because he thought Nakai was going to stab him.

¶ 75. Other than telling Nakai to get out of his house, Miller agreed that he did not give Nakai any warning before pulling the trigger. Miller estimated that he waited three or four seconds after telling Nakai to get out of his house before pulling the trigger. Miller did not tell Nakai he had a firearm. John told the investigating officer that he did not hear Miller tell Nakai to get out of his house before the shot, but at trial John said he did hear Miller say that and "immediately after that, I heard the shot." Russell testified he did not hear any warning before the shot. Immediately before Nakai was shot, Russell testified, Nakai was looking at him and John; he was not looking anywhere else, and he had forgotten about Miller.

¶ 76. Miller told the investigating officer that he "fired towards the bottom midsection, hip area, I think, just kind of . . . I didn't aim it, just kind of pointed it in the general area." He agreed on cross-examination that he pointed the gun at Nakai's "mid area." Miller testified that he did not intend to kill Nakai, but he agreed that

he intended to "cause great damage to [him]." Although Miller denied that he intended to shoot Nakai when he entered his bedroom, he also acknowledged that nothing had changed from the time he left the kitchen that caused him to decide to shoot Nakai.

¶ 77. A reasonable jury could conclude from the above evidence, viewing it in favor of the verdict, that Miller knew he was not in any immediate danger when he shot Nakai and neither were John and Russell, and that no reasonable person would have thought otherwise. A reasonable jury could conclude that Miller did not tell Nakai to leave just before the shot and, even if Miller did, it was not intended as a warning and Miller knew it could not have functioned as one because the shot came immediately after, and Miller knew Nakai could not have moved quickly because of his intoxication. Based on Russell's testimony on where Nakai was looking, a reasonable jury could infer either that Miller knew Nakai was not looking at him, or that Miller did not care whether Nakai was looking at him or not, despite Miller's testimony to the contrary. A reasonable jury could determine that Miller was so frustrated and angry with Nakai that he wanted to hurt him badly and this was his primary motivation.

¶ 78. The evidence of Miller's conduct immediately after he shot Nakai, viewed most favorably to the verdict, supports this determination. According to Russell's trial testimony, Nakai fell to the floor a couple of seconds after being shot. Russell told the investigating officer that when Nakai was shot, Miller came running down the hall with the shotgun and screamed "[g]et the fuck out of my house," and "I'm sick of this shit," and "[w]ill you open the door," although at trial Russell said he did not remember that. Russell did remember that Nakai said "I'm getting out" and was

trying to move as he lay on the floor, but he could move only very slowly. Russell acknowledged that Miller grabbed Nakai and tried to get him out the door and roll him down the steps. According to the investigating officer, Miller said that, after he shot Nakai, he went over to him and kicked him and tried to push or drag him out of the house, although at trial Miller denied this. Miller did admit that he stood over Nakai yelling at him to get out, with his gun still pointed at Nakai, because he was afraid Nakai could still harm them.

¶ 79. A reasonable jury could resolve the inconsistencies between Miller's and Russell's accounts to the investigating officer, on the one hand, and their trial testimony, on the other hand, by choosing to believe the former. Given the amount of blood described by other witnesses and given Russell's and other witnesses' descriptions of Nakai after he was shot, a reasonable jury could believe that it was evident to Miller that Nakai was seriously injured and was not a threat. A reasonable jury could decide that Miller's kicking and dragging Nakai out of the house was not done out of fear, as Miller testified, but out of anger and without regard to the fact that such treatment of Nakai at that time could exacerbate the threat to Nakai's life already posed by the injury Miller had just inflicted. A reasonable jury could have found this evidence of how Miller treated Nakai directly after the shooting more revealing of Miller's true motivation than the second call to 911, which Miller made after he kicked and dragged Nakai, and more revealing than Miller's subsequent inquiry whether Nakai was going to be all right.

¶ 80. Because I conclude that the evidence, if correctly evaluated, is sufficient to prove beyond a reasonable doubt that Miller showed utter disregard for

770

human life, I do not agree that Miller is entitled to a judgment of acquittal on the first-degree reckless injury charge.

## II. Ineffective Assistance of Counsel—First-Degree Reckless Injury

¶ 81. Because I conclude that Miller is not entitled to an acquittal on the first-degree reckless injury charge, I address his claim that he is entitled to a new trial on this charge because he received ineffective assistance of counsel. Specifically, he contends, and the trial court agreed, that counsel was ineffective with respect to a lesser-included offense instruction and with respect to the instruction given on self-defense. Miller also asserts that the circuit court erred in concluding that, although counsel performed deficiently in not conveying to him the offer of pleading to second-degree reckless injury, Miller was not prejudiced because he testified he would not have accepted the offer. I conclude trial counsel was not ineffective on any of these grounds.

### A. Lesser-Included Offense

¶ 82. The lesser-included offense at issue is second-degree reckless injury.[2] At the *Machner* hearing there was no dispute that Miller felt he had been justified in shooting Nakai as he did in order to defend

---

[2] There is no dispute that second-degree reckless injury is a lesser-included offense of first-degree reckless injury. Both require proof of reckless conduct causing great bodily harm, but first-degree reckless injury requires in addition proof of "circumstances which show utter disregard for human life . . . ." *Cf.* WIS. STAT. § 940.23(1)(a) *with* para. (2)(a) (1997–1998).

himself and others, that he conveyed this to trial counsel, and that they discussed and agreed on the self-defense and defense of others theory. Trial counsel testified that he thought Miller had a very strong defense based on the undisputed facts, on how Miller would come across to the jury, and on the persuasiveness of the testimony of John and Russell, with whom trial counsel had met. Trial counsel knew Miller planned post-graduate studies and did not want a felony conviction. Trial counsel believed that this was not "a prison case" even if Miller were convicted of the two crimes with which he was charged, and trial counsel felt the small risk of prison was worth trying to avoid conviction for a felony. Miller testified that his trial counsel was generally available to him and went over the defense with him. Miller also acknowledged that trial counsel would have reasonably had the impression that he, Miller, was not going to accept anything that would convict him of a felony.

¶ 83. The testimony of Miller and his trial counsel did conflict on the extent of discussions between them on a lesser-included offense. The circuit court found that, if trial counsel ever discussed lesser-included offenses with Miller, it was done in a general manner, Miller did not understand the concept, and Miller did not engage in a meaningful discussion on the merits of an all-or-nothing verdict versus lesser-included offenses. The circuit court also found that any discussion regarding an all-or-nothing verdict versus a compromised verdict was general and without a full understanding by Miller. Further, the court found that, had Miller been given the choice at the time, he would have requested submission of an instruction on the lesser-included offense of second-degree reckless injury. The court concluded that trial counsel was deficient because

he failed to specifically discuss and obtain Miller's rejection of requesting a lesser-included offense instruction in a situation in which a lesser-included offense is not inconsistent with the defense—here, self-defense and the defense of others. The court also concluded that "it appears that Miller was prejudiced" by this deficient performance because one conviction on second-degree reckless injury would have been far less serious than a conviction on the two more serious felonies.[3]

¶ 84. The State contends that trial counsel did not perform deficiently either in failing to adequately discuss the option of requesting an instruction for second-degree reckless injury or in failing to make that request because it was a reasonable trial strategy not to request it. Miller responds that trial counsel had a duty to discuss the option with him and that this is a ground for a determination of deficient performance separate and distinct from counsel's failure to request an instruction on the lesser-included offense, which, Miller contends, was also deficient performance.

¶ 85. I do not agree with Miller or the circuit court that failure to discuss the option of a lesser-included offense instruction with a defendant is a basis for a determination of deficient performance without regard to whether or not requesting an instruction was a reasonable trial strategy. More specifically, I do not agree with Miller's and the circuit court's reading of *State v. Ambuehl*, 145 Wis. 2d 343, 355–56, 425 N.W.2d

---

[3] The trial court was apparently referring to Miller's testimony that, had the jury convicted him of both lesser-included offenses—both being second-degree reckless injury—there could only be one conviction for second-degree reckless injury. However, the majority opinion in Section III, in which I join, has concluded that Miller was not entitled to a lesser-included offense instruction on the aggravated battery charge.

649 (Ct. App. 1988), and *State v. Eckert*, 203 Wis. 2d 497, 509, 553 N.W.2d 539 (Ct. App. 1996).

¶ 86. In *Ambuehl* we rejected the defendant's claim that trial counsel performed deficiently in failing to request a lesser-included offense instruction or at least to discuss the matter with her at the close of evidence. *Ambuehl*, 145 Wis. 2d at 354–55. Trial counsel discussed the instruction with her before trial and she rejected it; counsel did not again discuss it with her. *Id.* at 354. We stated that we "refuse to hold that, as a matter of law, it is always unreasonable for counsel to presume that the client's pre-trial decision not to request a lesser-included instruction will be the same after all the evidence is in." *Id.* at 357. We rejected each of the defendant's reasons for contending it was unreasonable for counsel to make that presumption in her case. *Id.* at 355–58.

¶ 87. There is language in *Ambuehl* that arguably may be read as an adoption by this court of the commentary to the ABA STANDARDS FOR CRIMINAL JUSTICE, § 4–5.2(a)(i) to the effect that counsel has a duty to initially confer with the client regarding a lesser-included offense and that the decision should belong to the client. *See Ambuehl*, 145 Wis. 2d at 355. Miller relies on this language. However, in *Eckert*, 203 Wis. 2d at 508–09, we expressly rejected this reading of *Ambuehl*.

¶ 88. In *Eckert* the defendant contended that trial counsel performed deficiently because he failed to discuss a lesser-included offense with him and failed to request the instruction. *Id.* at 507. After rejecting the argument based on *Ambuehl* and the ABA Standard, we referred to the well-established principle that there is neither a constitutional nor a fundamental right to request a lesser-included offense instruction. *Id.* at 509.

We also stated that "the decision of whether to request a lesser-included offense instruction is a complicated one involving legal expertise and trial strategy." *Id.* For these reasons, we explained

> [w]e are unwilling to conclude that trial counsel's failure to specifically discuss with Eckert the possible lesser-included offense of robbery and counsel's failure to request a lesser-included offense instruction constituted deficient performance.
>
> Rather, we conclude that a defendant does not receive ineffective assistance where defense counsel has discussed with the client the general theory of defense, and when based on that general theory, trial counsel makes a strategic decision not to request a lesser-included instruction because it would be inconsistent with, or harmful to, the general theory of defense.

*Id.* at 509–10.

¶ 89.　In *Eckert* the theory of defense, based on counsel's conversations with Eckert, was that Eckert was not present at and did not participate in the armed robbery, and counsel testified that it would be inconsistent with this theory to ask for the robbery instruction because that "would be telling the jury that Eckert was not there, but even if he was there, he did not know about the gun." *Id.* at 508, 510. "Under these circumstances," we stated, "we cannot hold that trial counsel was required to specifically discuss with Eckert a lesser-included offense instruction that would conflict with the defense theory. To require counsel to do so under these circumstances would unnecessarily intrude upon trial counsel's ability to strategically manage the client's defense." *Id.* at 510–11.

¶ 90.　Miller reads *Eckert* as carving out a "limited exception to the rule that counsel must consult with the

client on [lesser-included offenses]." In other words, according to Miller, *Eckert* holds that it is acceptable to not consult *only* when the instruction would be "inconsistent with, or harmful to, the general theory of defense." *See id.* at 510. I disagree. In *Eckert* we make clear that there is no general rule; we do not carve out an exception but instead identify the circumstances in that case that led us to conclude that counsel did not perform deficiently either in failing to discuss a lesser-included offense or failing to request an instruction on one. It does not follow that, if the circumstances differ in another case, there is deficient performance in failing to consult with a client on a lesser-included offense instruction.

¶ 91. It is true that in *Eckert* we did not directly address the more fundamental question of whether an ineffective assistance of counsel claim could rest solely on the failure to discuss a lesser-included offense instruction with a defendant without regard to whether it was a reasonable strategy not to request an instruction. We merged the discussion of the two and, in effect, the reasons why we concluded there was no duty to discuss such an instruction—defense counsel had discussed the general theory of defense and a lesser-included offense would have been inconsistent with or harmful to that defense—is the same reason it was a reasonable trial strategy.

¶ 92. To the extent that *Eckert* leaves open the question of when, if ever, there can be deficient performance for failure to discuss a lesser-included offense instruction with a defendant independent of an assessment of whether it is a reasonable trial strategy not to request one, I am not persuaded by Miller's argument that we should do so. Because a defendant does not have a constitutional or fundamental right to an in-

776

struction and because in Wisconsin we treat the decision as one of trial strategy, the critical issue is whether requesting, or not requesting, a lesser-included offense instruction is a reasonable trial strategy in the circumstances of the particular case. While it may often be advisable for counsel to discuss the options on this point with the defendant, even if counsel does not—if counsel's decision not to request a lesser-included offense instruction is a reasonable trial strategy in the circumstances of the particular case—the defendant has received effective assistance of counsel. Miller provides no authority for the proposition that trial counsel performs deficiently in not discussing the possibility of a lesser-included offense instruction with a defendant when it is a reasonable trial strategy not to request one, and I see no logic supporting that proposition.[4]

¶ 93. I think the flaw in basing a determination of deficient performance on trial counsel's failure to discuss a lesser-included offense instruction with the defendant is illustrated by the lack of coherence in Miller's prejudice discussion. Miller asserts he was prejudiced because the circuit court found that he would have insisted on requesting this instruction had he known it was an option and that the court would have given it and because there is a reasonable probability he would have been convicted on the lesser offense rather than

---

[4] I am not suggesting that the discussion an attorney *does* have with his or her client on the possibility of requesting a lesser-included offense instruction is irrelevant to an evaluation of whether the attorney's decision not to request one is a reasonable trial strategy. For example, if there is a discussion and the defendant insists he or she does not want one, that may be a factor in assessing the reasonableness of the attorney's decision not to request one. *See, e.g., State v. Ambuehl*, 145 Wis. 2d 343, 357, 425 N.W.2d 649 (Ct. App. 1988).

the greater offense. However, this overlooks the fact that Miller's trial counsel had a different view of the appropriate strategy and that the decision was not Miller's to make. *See Eckert,* 203 Wis. 2d at 509–10. At a later point in his discussion Miller recognizes that it is ultimately trial counsel's decision whether to request a lesser-included offense instruction, in that he argues that, if there is a discussion and the defendant disagrees with trial counsel's decision, the defendant can fire his attorney. But this suggests an entirely different prejudice analysis because it would require Miller to prove that he would have fired his attorney if his attorney disagreed and either would have been able to hire an attorney who would have requested the instruction or would have represented himself. There is no evidence that any of this would have happened (beyond Miller's testimony that he would have insisted on the instruction) and the speculative nature of this inquiry is problematic in itself. But, more importantly, this line of inquiry seems to have little to do with whether Miller received effective assistance of counsel at his trial.

¶ 94. Because I conclude that neither *Eckert* nor *Ambuehl,* as clarified by *Eckert,* supports the proposition that trial counsel here is deficient for inadequately discussing the option of a lesser-included offense instruction with Miller, I turn to trial counsel's decision not to request a lesser-included instruction for second-degree reckless injury. I conclude the decision was a reasonable trial strategy in the circumstances of this case. The difference between first-degree and second-degree reckless injury is that the former requires the additional element of "under circumstances which show utter disregard for human life." *Compare* Wis. Stat. § 940.23(1)(a) *with* para. (2)(a) (1997–1998). Although I have concluded in the preceding section that, viewing

the evidence in the light most favorable to the verdict, there was sufficient evidence of this element, I think it is a very close question. Two of my colleagues and the circuit court have concluded the evidence is not sufficient. I conclude it was reasonable for trial counsel to consider it unlikely that the jury would find this element satisfied beyond a reasonable doubt, and, therefore, to consider it likely that Miller would be acquitted on this charge. A jury could reject Miller's defenses of self-defense and defense of others and still decide that the State had not proved the utter disregard element beyond a reasonable doubt. On the other hand, if the jury had been given an instruction on second-degree reckless injury, it would very likely have found that the elements of recklessly causing great bodily harm were proved beyond a reasonable doubt, and Miller would then have been acquitted on this lesser charge only if the jury found he had acted in self-defense or defense of others.

¶ 95. Therefore, it was reasonable to think there was a lesser risk of a conviction on a felony (either first-degree reckless injury or second-degree reckless injury) if the jury did not have the option of the lesser offense.[5] This was in keeping with Miller's desire not to have a felony conviction at all. And, although there was a substantial difference in the maximum sentences for

---

[5] In my view this analysis is consistent with what defense counsel articulated at the *Machner* hearing. To the extent it differs somewhat and to the extent counsel offered other reasons for his decision that are less persuasive, I note that the proper inquiry is whether counsel's performance is objectively reasonable in the circumstances of this case and that counsel's testimony on his or her thinking is not dispositive. *State v. Kimbrough*, 2001 WI App 138, ¶¶ 31–35, 246 Wis. 2d 648, 630 N.W.2d 752.

each—ten years for first-degree reckless injury, a Class C felony, and five years for second-degree reckless injury, a Class D felony[6]—the significance of that difference in this case was much diminished. The circuit court agreed with trial counsel that this was not a prison case, meaning that the difference in sentences would be limited to months up to a year in jail and to the length of probation.

## B. Jury Instructions on Self-Defense

¶ 96. The circuit court instructed the jury on self-defense using WIS JI—CRIMINAL 805, "Privilege: Self-Defense: Force Intended or Likely to Cause Death or Great Bodily Harm . . ." rather than WIS JI—CRIMINAL 801, "Privilege: Self-Defense: Force Less Than That Likely to Cause Death or Great Bodily Harm: Crimes Involving Recklessness or Negligence . . . ." The circuit court concluded that trial counsel was deficient in failing to object to WIS JI—CRIMINAL 805 and failing to request WIS JI—CRIMINAL 801 and that this deficient performance may have prejudiced Miller. The State challenges this ruling on the ground of the absence of prejudice.

¶ 97. Assuming without deciding that defense counsel performed deficiently in not requesting WIS JI—CRIMINAL 801 and not objecting to WIS JI—CRIMINAL 805, I am not persuaded that there is a reasonable probability that, had the former instruction been given instead of the latter, the outcome on this charge would have been different. *See Strickland v. Washington*, 466 U.S. 668, 696 (1984).

---

[6] *Compare* WIS. STAT. §§ 940.23(1)(a) and 939.50(3)(c) (1997–1998) *with* §§ 940.23(2)(a) and 939.50(3)(d) (1997–1998).

780

¶ 98. The jury was instructed on the first-degree reckless injury charge and advised that in

> [d]etermining whether the conduct showed utter disregard for human life, you should consider all the factors relating to the conduct. These include the following: what the defendant was doing; why he was doing it; how dangerous the conduct was; how obvious the danger was; and whether the conduct showed any regard for human life.

WIS JI—CRIMINAL 1250. Immediately following this instruction the jury was advised that "[s]elf-defense is an issue in the case," self-defense was explained, and the jury was advised the State had to prove beyond a reasonable doubt that Miller was not acting lawfully in self-defense. Parallel instructions on the defense of others followed, preceded by "[d]efense of others is an issue in this case."

¶ 99. The only difference Miller points to between the instruction given and WIS JI—CRIMINAL 801 is that, after the latter states that "[s]elf-defense is an issue in this case," it advises the jury that "[i]n deciding whether the defendant's conduct was criminally reckless conduct which showed utter disregard for human life, you should consider whether the defendant acted lawfully in self-defense." Presumably similar language would also be included concerning the defense of others.

¶ 100. Although the jury was not expressly told it should consider the evidence relating to self-defense and defense of others in determining if Miller acted in utter disregard of human life, I conclude a reasonable jury would understand from the instruction given that it was to consider this evidence as part of its consideration of "what the defendant was doing [and] why he was doing it." WIS JI—CRIMINAL 1250.

781

## C. Failure to Convey the State's Plea to Miller

¶ 101. The circuit court found that the State made a plea offer that would involve Miller pleading to second-degree reckless injury, but trial counsel did not convey the offer to Miller because he believed Miller was not interested in pleading to any charge. Although the circuit court determined this was deficient performance, it concluded there was no prejudice because Miller testified that he probably would not have pleaded guilty or no contest to that charge.

¶ 102. Miller asks that we either make a different factual finding on whether Miller would have accepted the plea offer or remand for more fact finding on this point. I would decline to do either.[7]

¶ 103. The circuit court's finding that Miller would probably not have accepted the plea offer is not clearly erroneous: that is what Miller testified. We must therefore accept it. WIS. STAT. § 805.17(2).

¶ 104. Miller's argument for a remand is that he did not raise the issue of the plea offer in his motion because he first learned about the offer from his trial counsel's testimony at the *Machner* hearing. Therefore, he asserts, the testimony on the circumstances of the plea offer was incomplete and his response would have been different if he knew all the circumstances. According to Miller, the circuit court addressed the issue sua sponte. I conclude these circumstances do not warrant

---

[7] Apparently the plea offer was that Miller would plead to one count of second-degree reckless injury and the State would dismiss both the first-degree reckless injury charge and the aggravated battery charge. In Section IV, ¶ 56 of the majority opinion, we reject Miller's claim of ineffective assistance of counsel on this ground with respect to the aggravated battery charge.

a remand. There were several options open to Miller, represented by counsel, once trial counsel testified about the plea offer. During the hearing Miller could have examined trial counsel about it or asked for a continuance of the hearing to explore the issue further. If Miller's point is that he did not know the court was going to address the issue until the court issued its written decision, there is still no reason Miller could not then have brought a motion in the circuit court to ask that further evidence be taken on the issue.