**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**August 25, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP1123-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CF980

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

MOHAMMED A. MAGHFOUR,

  DEFENDANT-APPELLANT.

         APPEAL from a judgment and an order of the circuit court for Milwaukee County:  THOMAS J. McADAMS and T. CHRISTOPHER DEE, Judges. *Affirmed.*

         Before Brash, P.J., Blanchard and White, JJ.

         **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. This is an appeal from an order denying postconviction relief to Mohammed Maghfour and the underlying judgment of conviction. Following his convictions at a jury trial, Maghfour seeks relief from judgments on two counts of first-degree recklessly endangering safety with use of a dangerous weapon. Maghfour makes two arguments. The first is that an evidentiary hearing is necessary to determine whether he is entitled to a new trial because the State violated one of its discovery obligations under the criminal discovery statute, WIS. STAT. § 971.23(1)(e) (2017-18),[1] by failing to produce a recording of an interview with a witness. We reject this argument because Maghfour forfeited it by failing to raise it in a timely fashion at trial. Maghfour's second contention is that an evidentiary hearing is necessary to determine whether he received effective assistance of counsel. We conclude that he failed to make a showing sufficient to obtain a *Machner* hearing.[2] Accordingly, we affirm.

## BACKGROUND

¶2    The criminal complaint alleged that in the early morning hours of Sunday, February 28, 2016, Maghfour used a handgun to shoot two men, J.M. and J.G., wounding the legs of both men but not killing either of them. This allegedly occurred outside a Milwaukee house where J.M. and J.G. had just attended a party.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] *See* **State v. Machner**, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) (describing need for an evidentiary hearing to allow allegedly ineffective counsel to be examined and have his or her testimony preserved); *but see* **State v. Allen**, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433 (circuit court not required to hold hearing on postconviction motion claiming ineffective assistance of counsel if motion fails to allege facts that, if true, would entitle the defendant to relief, or if the record "conclusively demonstrates that the defendant is not entitled to relief").

The formal charges were that Maghfour had recklessly endangered the safety of both J.M. and J.G., under circumstances that showed utter disregard for human life, while using a dangerous weapon, contrary to WIS. STAT. §§ 941.30(1), 939.50(3)(f), and 939.63(1)(b).

¶3      Maghfour was convicted following a three-day jury trial.[3]  Both J.M. and J.G. testified but Maghfour did not.  We summarize additional evidence below in the discussion section, as pertinent to particular arguments of the parties, but the following is basic background.

¶4      J.M. testified at trial in part as follows.  J.M. attended a house party with friends, including J.G.  Outside the house, sometime between 1:00 a.m. and 2:00 a.m., J.G. and Maghfour (whom J.M. knew) got into an argument.  J.G. "scream[ed], 'Shoot me, shoot me,' and … a bunch of gunshots went off."  Maghfour fired the gun, in a series of "seven or eight" shots.  J.M. was hit with rounds or fragments of rounds "[t]hree times in -- in my right leg and then once in my left leg and then once in my back."  Maghfour "[h]opped into a car and left."

¶5      J.G. was also called as a witness by the State.  But unlike J.M., J.G. from the start of his testimony presented as a hostile witness to the prosecutor.  J.G. testified that he had "better things to do" than to testify and that "[i]t doesn't really matter" where he was in the early morning hours of February 28, 2016.  He testified that he did not remember much about that night, except that he had been drinking a lot and that he was shot.  He denied any memory of giving a statement about the shooting to police at the hospital that night.

_____

[3] The Honorable Thomas J. McAdams presided over the trial.  The Honorable T. Christopher Dee resolved postconviction proceedings.

¶6     A detective testified that J.G. had made statements at the hospital on the night of the shootings that included the following. As J.G. was walking out of the party, J.G. "may have given … a dirty look" to a white male of possibly Middle Eastern descent, whom J.G. was able to describe. That man pointed a gun at J.G.'s head and asked, "What's up now, bitch-ass nigger?" After J.G. replied, "I ain't on anything," the man redirected "the gun from [J.G.'s] head" so that it was now pointed "down to the ground" and then "fired two rounds." J.G. felt pain after the first shot and he heard J.M. scream after the second shot.

¶7     Another detective testified that, the day after the shootings, J.G. identified Maghfour as the shooter from a photo array.

¶8     After Maghfour was convicted and sentenced, and with the assistance of postconviction counsel, he moved under WIS. STAT. § 809.30(2)(h) for a new trial. He raised two arguments that he continues to pursue on appeal. The first is that State violated the reciprocal discovery statute, which requires that the State provide, upon request, "[a]ny relevant written or recorded statements of a witness" within a "reasonable time before trial." WIS. STAT. § 971.23(l)(e). Despite a request by trial counsel for all recorded statements of named witnesses, the State failed to produce a video recording of an officer's interview with J.M. the day after the shooting. The circuit court rejected this argument without holding an evidentiary hearing, in part on the ground that it "would not have been reasonably probable" that it would have changed the outcome at trial if trial counsel had received a copy of the video.

¶9     Maghfour's second postconviction motion argument that he renews on appeal is that he is entitled to a new trial because trial counsel provided ineffective assistance of counsel in failing to obtain the video of J.M. being

4

interviewed and in failing to impeach J.M. more thoroughly, based in part on J.M.'s statements in the video that were not disclosed at trial. The circuit court rejected this argument without holding an evidentiary hearing, on the ground that Maghfour had failed to identify how the potential for impeachment at a new trial would be "reasonably probable to have an impact on the verdict." Maghfour now appeals.

## DISCUSSION

### I. DISCOVERY

¶10 Maghfour argues that an evidentiary hearing is necessary to determine whether he is entitled to a new trial because the State violated its discovery obligation under WIS. STAT. § 971.23(1)(e) to produce a video recording of a police interview with J.M. on the day after the shootings. We reject this argument because Maghfour forfeited it by failing to raise the discovery issue in a timely fashion at or before trial. We provide additional background on this issue, summarize the applicable law, and then apply the facts to the legal standard.

#### A. Additional Background

¶11 Before trial, the State identified J.M. as a potential witness. Maghfour filed a timely pretrial discovery demand for "any and all relevant … recorded statements" of identified witnesses, such as J.M. Therefore, the State was obligated to produce any such recorded statements under WIS. STAT. § 971.23(1)(e). It is undisputed that the State failed to produce a recording of the

police interview of J.M. that was in the possession of the police, and that the defense obtained the recording only after pursuing the topic post-trial.[4]

¶12    However, before trial the State did produce to the defense a police report purporting to reflect statements made by J.M. in the recorded interview. Further, the narrative portion of the report began with this prominent statement (including the asterisks used for emphasis):  "**Interview was recorded on officer body camera.**"  It is undisputed that Maghfour never raised this discovery issue before or during trial, despite this notice in the report of the existence of the recording.

### B.    Forfeiture Law And Analysis

¶13    "It is a fundamental principle of appellate review that issues must be preserved at the circuit court.  Issues that are not preserved at the circuit court, even alleged constitutional errors, generally will not be considered on appeal." *State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727.  This is "an essential principle of the orderly administration of justice," and "promotes both efficiency and fairness."  *Id.*, ¶11.  Further, in some situations, "a defendant may forfeit a right if the defendant fails to object at the time the right is violated." *See State v. Coffee*, 2020 WI 1, ¶19, 389 Wis. 2d 627, 937 N.W.2d 579; *see also Huebner*, 235 Wis. 2d 486, ¶¶26-35.

¶14    The State argues that Maghfour forfeited his claim of a violation of WIS. STAT. § 971.23(1)(e) by failing to raise it in a timely manner.  In making this

---

[4] The failure of the prosecution to produce the recording was allegedly due to police mislabeling of the recording, but we need not address that issue given Maghfour's forfeiture.

argument, the State emphasizes that the only claim Maghfour makes is based on the requirements of § 971.23, and by its terms this statute provides for remedies at trial. We agree that forfeiture applies here for the following reasons.

¶15 The "important objectives" that the forfeiture rule serves, as explained in *Huebner*, are well served in this case. *See Huebner*, 235 Wis. 2d 486, ¶12. Maghfour failed to give the circuit court a chance to correct or avoid the alleged error in the first place and failed to give either the court or the parties "notice of the issue and a fair opportunity to address the objection." *See id.* Further, failure to apply the forfeiture rule in circumstances such as those presented here might lessen the incentives for attorneys to "diligently prepare for and conduct trials" and encourage "'sandbagging' errors, or failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal." *See id.* (citation omitted).

¶16 After the State advances these arguments, Maghfour fails to develop a substantive reply that we can discern. It is unclear, but Maghfour may intend to argue for the existence of the following forfeiture-related rule. Whenever the prosecution fails to make a pretrial disclosure in apparent violation of WIS. STAT. § 971.23, it could be appropriate to apply the forfeiture rule to bar a later defense objection *only* if defense counsel had affirmative evidence at or before the time of trial that the non-disclosure was being done without "good cause." We have trouble understanding the basis for such a rule, and in any case Maghfour does not persuade us that forfeiture should not apply here.

¶17 Having forfeited the issue, Maghfour is not entitled to an evidentiary hearing.

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL

¶18    Maghfour argues that an evidentiary hearing is necessary to determine whether he received effective assistance of counsel.  We conclude that he fails to show the need for a *Machner* hearing because, regardless of the details or credibility of the testimony that he could elicit at a hearing, he fails to show prejudice.  We provide additional background on this issue, summarize pertinent law, and then apply the facts to the legal standard.

### A.    Additional Background

¶19    The recorded police interview with J.M. that we have referenced above was one of two statements that J.M. made to police on the day following the shootings.  Police did not record the first interview, but they did record the second, referenced above.  Police purported to memorialize the substance of both interviews in reports that were, in each case, disclosed to the defendant in advance of trial.

¶20    The following account comes from a detective's short summary of the first, unrecorded interview with J.M.  J.M. said that someone he knows as "Speedy" was arguing with "some people outside" the party when J.M. and J.G. walked out of the house where the party was.  This part of the report appears to imply that J.M. conveyed that Speedy's argument was with persons other than J.M. or J.G.  Speedy fired five shots "towards" J.M. and J.G.  This account does not purport to quote J.M. providing any detail whatsoever about the shooting; it simply states that J.M. said that Speedy fired the five shots "towards" J.M. and J.G.  The only explanation for the shooting is the following:  J.M. "believes that the shooting stemmed from something that happened at the House of Corrections between" Speedy and J.G.

¶21  The following account comes from an officer's summary of the second, recorded interview with J.M.  Officers showed J.M. a sequential array that included a photo of Maghfour, and J.M. identified him as the shooter.  J.M. said that he was "very sure of his identification," explaining that he had known Maghfour since J.M. was about nine years old and that the two had been "close friends in middle school."  J.M. further said that he ran into J.G. at the party (as opposed to going to the party with him).  J.M. said that he believed that Maghfour "did not intend to shoot him and J.G.," but instead "had argued with an unknown Hispanic male during the party."  J.M. gave a description of the Hispanic male.  More specifically, J.M. said that he and J.G. were standing to the right side of the Hispanic male, outside the party on the sidewalk, while the Hispanic male and Maghfour argued.  As Maghfour faced the Hispanic male and was about five to six feet from him, Maghfour "pointed his gun downward and shot multiple times, striking" J.M. and J.G.

¶22  Before turning to what is reflected in the recording of the second police interview of J.M. now highlighted by Maghfour, we pause to observe that there are obvious differences among:  the contents of the report summarizing the first interview; the contents of report summarizing the second interview; and the substance of J.M.'s testimony at trial.  The first report has J.M. calling the shooter "Speedy" and not, as in the second report, saying that he had known the shooter since boyhood.  In addition, the first report has J.M. attributing the shootings to a bad history between the shooter and J.G. while the two were confined, while the second report focuses on a dispute between the shooter and a Hispanic male.  Further, as summarized above, in his trial testimony J.M. testified that J.G. and Maghfour got into an argument just before the shootings, with J.G. "screaming, 'Shoot me, shoot me.'"  These were all differences, and potential impeachment

material, that was available to trial counsel through the pretrial production of the reports.

¶23     We now summarize the aspects of the recording of the second interview that Maghfour contends were not available to defense counsel because, at the time of trial, counsel had only the summary in the produced report.  To begin, Maghfour points out that the video shows J.M.'s manner in giving the version reflected in the report of the second interview—as Maghfour puts it, "the ease with which J.M. was able to string together" this particular version of events.  Further, the recording (but not the report) reflects that J.M. asked police how much time Maghfour could potentially be facing for shooting him, and when police responded that Maghfour faced a first-degree recklessly endangering safety charge, J.M. replied, "I thought shooting someone was an attempted homicide."

¶24     The State does not dispute that defense counsel at trial did not attempt to impeach J.M. with inconsistencies among his prior statements reflected in the reports of the first and second interviews and his testimony at trial, and of course cannot dispute that trial counsel lacked the recording as a basis for impeachment.

### B.     Pertinent Law And Analysis

¶25     The pertinent ineffective assistance of counsel standards are well established:

> "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." The same right is guaranteed under Article I, Section 7 of the Wisconsin Constitution.  Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact.  The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact,

10

which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo. To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial. If the defendant fails to satisfy either prong, we need not consider the other.

….

Whether any deficient performance was prejudicial is … a question of law we review de novo. To establish that deficient performance was prejudicial, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*State v. Breitzman*, 2017 WI 100, ¶¶37, 39, 378 Wis. 2d 431, 904 N.W.2d 93 (citations omitted). "In an ineffective assistance of counsel claim, *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] 'places the burden on the defendant to affirmatively prove prejudice.'" *State v. Roberson*, 2006 WI 80, ¶35, 292 Wis. 2d 280, 717 N.W.2d 111 (citation omitted).

¶26 We assume without deciding that it was deficient performance for trial counsel not to have successfully pursued the recording of the second interview. We further assume without deciding that trial counsel did not have a reasonable strategic reason for not attempting to make the best possible uses of each of the inconsistencies cited by Maghfour in cross examining J.M. Finally, we assume that all of J.M.'s various statements would have been admissible. With these assumptions in mind, we agree with the State that all of the inconsistencies cited by Maghfour are minor and peripheral to the essential facts, and for this reason Maghfour fails to show a reasonable probability of a different result if trial counsel had attempted to make the best use of the inconsistencies. Put differently,

11

Maghfour fails to persuade us that any evidence he could elicit at an evidentiary hearing would establish prejudice meriting a new trial.

¶27 Maghfour's argument ignores the consistency of J.M.'s essential account and the lack of any reasonable inference that could arise from inconsistencies that anyone *other* than Maghfour was the reckless shooter or that Maghfour had any justification in firing the gun. It is important to note, as the State points out, that Maghfour was not charged with any form of attempted homicide. Without engaging in speculation, none of the inconsistencies appears to have any bearing on the only real issue at trial: without any need for self-defense or other justification, did Maghfour fire the handgun multiple times in such a reckless manner that rounds or fragments of rounds hit the legs of two men standing near him? This describes conduct that a jury could easily conclude constitutes utter disregard for human life, whether Maghfour was trying to hurt or frighten a Hispanic man or trying to hurt or frighten J.M. or J.G.[5] In short, the inconsistencies at issue do not come close to supporting Maghfour's exaggerated position that "the most reasonable" explanation for them is that J.M.'s account at trial was "pure fiction." The jury in this case heard evidence that Maghfour fired downward, which was consistent with wounds to the legs of the two victims, so that would not be new evidence at a new trial.

---

[5] A person acts with utter disregard for human life when the person acts with "'a state of mind which has no regard for the moral or social duties of a human being,'" in this case the two human beings who were hit with rounds or fragments of rounds. *See State v. Miller*, 2009 WI App 111, ¶33, 320 Wis. 2d 724, 772 N.W.2d 188 (citation omitted). The fact finder is to examine all evidence revealing the acts that caused the injury and the totality of the circumstances. *See id.*, ¶34.

¶28   As the State acknowledges, the most significant of the potential inconsistencies appears to be the statement J.M. made during the second interview about Maghfour being in a dispute with a Hispanic man just before the shootings. At least on its face, this differs, for example, from the account reflected in the first police report about alleged bad history between Maghfour and J.G. apparently being behind the shootings.   However, nothing about this inconsistency undermines J.M.'s relevant statements about Maghfour recklessly shooting J.M. and J.G., or points to a plot to frame Maghfour for a reckless shooting that he did not commit.

¶29   As the State points out, J.M.'s testimony was not the only evidence that Maghfour was the shooter.  The jury heard evidence in the form of a recorded phone call that Maghfour wanted J.M. and J.G. to testify that they were drunk and that they could not remember what happened, as opposed to telling the truth about the shooting.  The jury also heard, as summarized above, testimony about J.G.'s statements to police that directly incriminated Maghfour.

¶30   Neither of the two aspects of the second interview recording that Maghfour contends contribute to his prejudice argument have any weight.  It is pure speculation that J.M.'s "ease" of manner in relating the same statements reflected in the police report would have helped the defense.

¶31   As to J.M.'s statement to police, "I thought shooting someone was an attempted homicide," Maghfour provides no reason to think that this was not a completely ordinary, innocent statement under the circumstances.  That is, without some additional explanation or context, it would seem to be merely the kind of comment that one might expect to hear from someone who has just been injured by gunfire through no fault of his own in an extremely reckless incident and who

is not a student of the criminal law attuned to distinctions between intentional and reckless offenses.

*By the Court*.—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.